# EXHIBIT "1"

# EXHIBIT "1"

1 | **LEWIS BRISBOIS BISGAARD & SMITH LLP**
ELISE D. KLEIN, SB# 111712
2 |    E-Mail: Elise.Klein@lewisbrisbois.com
633 West 5th Street, Suite 4000
3 | Los Angeles, California 90071
Telephone: 213.250.1800
4 | Facsimile: 213.250.7900

5 | Attorneys for Defendant, PCM, INC. WELFARE
BENEFIT PLAN

6 |

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange

**03/20/2017** at 03:29:00 PM
Clerk of the Superior Court
By e Clerk, Deputy Clerk

7 |

8 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 | COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

10 |

11 | ST. JOSEPH HOSPITAL OF ORANGE, a
California Corporation,

12 |          Plaintiff,

13 |     vs.

14 | PCM, INC. WELFARE BENEFIT PLAN; and
DOES 1 through 25, inclusive,

15 |          Defendant.

16 |

CASE NO. 30-2016-00894580-CU-BC-CJC

**NOTICE TO STATE COURT OF REMOVAL OF ACTION TO FEDERAL COURT**

17 | TO THE CLERK OF THE SUPERIOR COURT OF CALIFORNIA IN AND FOR THE

18 | COUNTY OF ORANGE:

19 |     PLEASE TAKE NOTICE that, under the provisions of 28 U.S.C. § 1446(d), on March 17,

20 | 2017, Defendant PCM, Inc. Welfare Benefit Plan("Defendant") filed with the Clerk of the Court at

21 | the United States Courthouse, Central District of California, Southern Division, located at 411 W.

22 | 4th Street, Santa Ana, CA 92701, the attached Notice of Removal to Federal Court (Exhibit "1")

23 | and supporting papers to accomplish the removal of the action pending in the Superior Court of

24 | California in and for the County of Orange, entitled *St.Joseph Hospital of Orange, a California*

25 | *Corporation, Plaintiff, v. PCM, Inc. Welfare Benefit Plan;. and DOES 1-23, inclusive, Defendants,*

26 | Case No. 30-2016-00894580-CU-BC-CJC, to the United States District Court for the Central

27 | District of California, Southern Division. Under 28 U.S.C. §§ 1441 and 1446, and Federal Rules

28 | of Civil Procedure, Rule 81(c), this action will be placed on the docket of the aforementioned

**LEWIS
BRISBOIS
BISGAARD
& SMITH LLP**
ATTORNEYS AT LAW

1 | District Court for all further proceedings.

2 | DATED: March __, 2017        LEWIS BRISBOIS BISGAARD & SMITH LLP

3

4 | By: _____

5 | Elise D. Klein
  | Attorneys for Defendant, PCM, INC. WELFARE
6 | BENEFIT PLAN

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4850-7154-3621.1                    2
NOTICE TO STATE COURT OF REMOVAL OF ACTION TO FEDERAL COURT

# EXHIBIT "1"

# EXHIBIT "1"

1 | **LEWIS BRISBOIS BISGAARD & SMITH** LLP
ELISE D. KLEIN, SB# 111712
2 |    E-Mail: Elise.Klein@lewisbrisbois.com
633 West 5th Street, Suite 4000
3 | Los Angeles, California 90071
Telephone: 213.250.1800
4 | Facsimile: 213.250.7900

5 | Attorneys for Defendant, PCM, Inc.
Welfare Benefit Plan

6 |

7 |

8 |                    UNITED STATES DISTRICT COURT

9 |          CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

10 |

11 | ST. JOSEPH HOSPITAL OF          CASE NO. 8:17-cv-00487
ORANGE, a California Corporation,
12 |                                **NOTICE OF REMOVAL**
                Plaintiff,
13 |
        vs.
14 |
PCM, INC. WELFARE BENEFIT
15 | PLAN; and DOES 1 through 25,
inclusive,
16 |
                Defendant.
17 |

18 |      TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

19 |          PLEASE TAKE NOTICE that Defendant, PCM, Inc. Welfare Benefit Plan

20 | (the "Plan"), hereby removes to this Federal Court the State Court action described

21 | below. In support of this notice of removal, the Plan shows the Court as follows:

22 |          1.      On December 27, 2016, Plaintiff filed a complaint in the Superior

23 | Court of the State of California in and for the County of Orange, entitled *St. Joseph*

24 | *Hospital of Orange v. PCM, Inc. Welfare Benefit Plan; and Does 1 through 25,*

25 | *inclusive,* Case No. 30-2016-00894580.  The summons and complaint were served

26 | on the Plan on February 23, 2017.  A true and correct copy of the summons and

27 | complaint are attached hereto, collectively, as Exhibit A.  No other documents have

28 | been served on the Plan.

4849-5257-7093.1

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

2.    Plaintiff's claims against the Plan are removable to this Court pursuant to this Court's federal question jurisdiction and diversity jurisdiction—either of which are alone sufficient to permit the removal of this action to this Court.

3.    This Court possesses federal question jurisdiction over this action because Plaintiff seeks recovery of benefits under an employee welfare benefit plan and such claims for benefits are completely preempted by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA").  Any civil action brought in state court may be removed to federal court if the federal court has original jurisdiction over the action. 28 U.S.C. § 1441(a).  Federal courts have original jurisdiction over cases that arise under federal laws.  28 U.S.C. § 1331.  When an action contains a claim arising under federal law, the entire action is removable to federal court.  28 U.S.C. § 1441(c)(1).   Thus, if any of Plaintiff's claims arise under federal law, removal is proper.

4.    Plaintiff sued the Plan, which is an employee welfare benefit plan and an entity that may be sued as an entity under ERISA. *See* 29 U.S.C. § 1132(d). A copy of the summary plan description and plan document is attached as Exhibit B.

5.    Plaintiff alleges that it provided health care services to a patient (the "Patient") covered by the Plan. (Exhibit A, at ¶ 8.)

6.    Plaintiff asserts various causes of action against the Plan in connection with seven separate instances in which Plaintiff treated the Patient. (Exhibit A, at ¶¶ 17–97.)

7.    Plaintiff concedes there was no express agreement between Plaintiff and the Plan as to amount the Plan would pay Plaintiff for the goods and services provided to the Patient. (Exhibit A, at ¶ 104.)

8.    Plaintiff contends it timely submitted claims for payment to the Plan, but the Plan allegedly "failed to fully reimburse" Plaintiff for services provided to the Patient "at a reasonable rate."  (Exhibit A, at ¶ 106.)  Plaintiff admits it was paid by the Plan, but Plaintiff nevertheless seeks additional payment from the Plan for

1 | health care services provided to Patient, who was a participant in the Plan. (Exhibit
2 | A, at ¶ 122.) Plaintiff alleges it "has been damaged in an amount not less than
3 | $565,382.75." (Exhibit A, at ¶ 108.) Plaintiff does not allege the existence of any
4 | agreements between Plaintiff and Defendants. Only the Plan documents govern the
5 | amounts that the Plan must pay to Plaintiff for hospital goods and services provided
6 | to Plan participants such as the Patient.

7 |      9.    Plaintiff asserts two causes of action predicated on the Plan's alleged
8 | failure to pay the benefits due under the Plan documents. In Count I, Plaintiff seeks
9 | additional payment from the Plan in an amount not less than $565,382.75 under the
10 | theory of breach of implied in fact contract. In Count II, Plaintiff seeks an amount
11 | exceeding $565,382.75 under the theory of *quantum meruit.* In Count III, Plaintiff
12 | seeks $567,193.02 under an open book account theory. In Count IV, Plaintiff seeks
13 | $563,868.16 on a promissory estoppel theory. And, in Count V, Plaintiff seeks an
14 | amount no less than $2,253.07 on its estoppel theory. Each of these theories are
15 | thinly veiled efforts to recover additional benefits from an ERISA plan.

16 |      10.    ERISA governs employee benefit plans that are established or
17 | maintained by an employer for the purposes of providing benefits to its employees.
18 | 29 U.S.C. § 1003(a)(2). An employee welfare benefit plan is "any plan, fund or
19 | program which was heretofore or is hereafter established or maintained by an
20 | employer or by an employee organization, or by both, to the extent that such plan,
21 | fund, or program was established or is maintained for the purpose of providing for
22 | its participants or their beneficiaries, through the purchase of insurance or otherwise,
23 | (A) medical, surgical, or hospital care or benefits, or benefits in the event of
24 | sickness, accident, disability, death . . . ." 29 U.S.C. § 1002(1).

25 |      11.    Here, Plaintiff sued the Plan itself to obtain additional payment for
26 | services provided to a Plan participant. The summary plan description and plan
27 | document confirm the Plan is governed by ERISA. (Exhibit B, at P. 3.)

28 |      12.    While the well-pleaded complaint rule generally controls whether an

**LEWIS**
**BRISBOIS**
**BISGAARD**
**&SMITH LLP**
ATTORNEYS AT LAW

4849-5257-7093.1

1 action arises under federal law, ERISA is an exception to the well-pleaded

2 complaint rule. *Aetna Health Inc. v. Davila*, 542 U.S. 200, 207–08 (2004). The

3 civil enforcement provisions contained in ERISA provide the exclusive vehicle for

4 actions to recover benefits under an ERISA plan. *See Pilot Life Insurance Co. v.*

5 *Dedeaux*, 481 U.S. 41 (1987); *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58

6 (1987). ERISA's civil enforcement mechanism has "such extraordinary pre-emptive

7 power that it converts an ordinary state common law complaint into one stating a

8 federal claim for purposes of the well-pleaded complaint rule." *Davila*, 542 U.S. at

9 209. Causes of action within the scope of 29 U.S.C. § 1132(a) are removable to

10 federal court. *Taylor*, 481 U.S. at 66. "[I]f an individual brings a suit complaining

11 of a denial of coverage for medical care, where the individual is entitled to such

12 coverage only because of the terms of an ERISA-regulated employee benefit plan,

13 and where no legal duty (state or federal) independent of ERISA or the plan terms is

14 violated, then the suit falls within the scope of ERISA." *Davila*, 542 U.S. at 210.

15      13.   ERISA authorizes a civil action to recover benefits due under the terms

16 of the plan or enforce rights under the terms of the plan. 29 U.S.C. § 1132(a)(1)(B).

17 ERISA also permits an action to obtain other appropriate relief, including injunctive

18 relief, to redress violations of the plan or ERISA or to enforce any provision of

19 ERISA. 29 U.S.C. § 1132(a)(3). Health care providers, like Plaintiff, may bring a

20 civil action under ERISA. *Spinedex Physical Therapy USA Inc. v. United*

21 *Healthcare of Ariz., Inc.*, 770 F.3d 1282, 1291 (9th Cir. 2014).

22      14.   Plaintiff's claims against the Plan fall within the scope of ERISA and

23 are completely preempted. Plaintiff's claims are simple, straightforward claims for

24 ERISA benefits. Plaintiff alleges on seven occasions it provided services to the

25 Patient—who was a participant in the Plan, Plaintiff timely submitted claims for

26 payment to the Plan, the Plan paid less than the full amount billed by Plaintiff, and

27 Plaintiff now seeks to recover the difference between the amount billed to the Plan

28 and the amount paid by the Plan. (Exhibit A, at ¶ 8, 21, 24, 27–28, 29–32, 34–35,

LEWIS
BRISBOIS
BISGAARD
&SMITH LLP
ATTORNEYS AT LAW

4849-5257-7093.1

1  36, 38–39, 41–42, 43, 48, 50–51, 53–55, 66–67, 69–71, 81–82, 84–86, 93–94, 96–

2  97.)  Plaintiff could have brought its claims for benefits and injunctive relief under

3  ERISA and these claims are not supported by any legal duty arising outside of the

4  ERISA Plan.  *See Davila*, 542 U.S. at 210.  Accordingly, Plaintiff's claims are

5  completely preempted and this action is removable to this Court.

6         15.    If, as the Plan contends, this action is governed by ERISA, Plaintiff's

7  non-ERISA claims are preempted.  See, e.g., *Pilot Life Ins. Co. v. Dedeaux*, 481

8  U.S. 41, 57, 107 S. Ct. 1549, 95 L. Ed. 2d 39 (1987).

9         16.    This Court has also original jurisdiction over this action under 28

10  U.S.C. § 1332, and Defendant may remove it to this Court pursuant to 28 U.S.C.

11  § 1441(b) because it is a civil action between citizens of different states and the

12  amount in controversy exceeds the sum of $75,000, exclusive of interests and costs.

13         17.    Plaintiff is a California corporation with its principal place of business

14  in California. Exhibit A, at ¶ 2.

15         18.    The Plan is an employee welfare benefit plan. The Plan is not

16  incorporated.

17         19.    An employee benefit plan may be sued as an entity pursuant to 29

18  U.S.C. § 1132(d). The Plan was located at 8337 Green Meadows Drive N, Lewis

19  Center, Ohio 43035. (Exhibit B, at p. 3.) The Plan's agent for service of legal

20  process was located at the same address. (Exhibit B, at p. 3.) The Plan is a citizen of

21  Ohio.

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

LEWIS
BRISBOIS
BISGAARD
&SMITH LLP
ATTORNEYS AT LAW

4849-5257-7093.1

5

1     20.   Thus, there is complete diversity between the Plaintiff and the

2  Defendant, and the amount in controversy exceeds $75,000.

3     21.   Defendants will promptly file a copy of this Notice of Removal in the

4  Superior Court of the State of California in and for the County of Orange.

5  DATED: March 17, 2017       LEWIS BRISBOIS BISGAARD & SMITH LLP

6

7                    By:     /s/ Elise D. Klein

8                           Elise D. Klein
                           Attorneys for Defendant, PCM, Inc.

9                           Welfare Benefit Plan

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

**SUM-100**

# SUMMONS
## *(CITATION JUDICIAL)*

| | |
|---|---|
| **NOTICE TO DEFENDANT:**<br>*(AVISO AL DEMANDADO):*<br><br>PCM, INC. WELFARE BENEFIT PLAN; and DOES 1 through 25, inclusive<br><br>**YOU ARE BEING SUED BY PLAINTIFF:**<br>*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*<br><br>ST. JOSEPH HOSPITAL OF ORANGE, a California Corporation | **FOR COURT USE ONLY**<br>*(SOLO PARA USO DE LA CORTE)*<br><br>**ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of Orange<br><br>**12/27/2016** at 06:01:35 PM<br>Clerk of the Superior Court<br>By Alexander Morgan,Deputy Clerk |

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br><br>SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE<br>700 Civic Center Drive West, Santa Ana, CA 92701 | **CASE NUMBER:**<br>30-2016-00894580-CU-BC-CJC<br><br>Judge Craig Griffin |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

| | |
|---|---|
| Carrie McLain (SBN 181674) / Kim Worobec (SBN 220035) / Sara A. Popovich (SBN 306700) | Fax.: (562) 901-4488 |
| HELTON LAW GROUP, APC - 7711 Center Ave., Suite 350, Huntington Beach, CA 92647 | Phone No.: (562) 901-4499 |

| DATE:<br>*(Fecha)* | 12/27/2016 | DAVID H. YAMASAKI, Clerk of the Court | Clerk, by<br>*(Secretario)* | Alexander Morgan | , Deputy<br>*(Adjunto)* |
|---|---|---|---|---|---|

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*    Alexander Morgan

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:

3. ☐ on behalf of *(specify)*:

under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
       ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
       ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
       ☐ other *(specify)*:
4. ☐ by personal delivery on *(date)*:

Page 1 of 1

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS**<br>EXHIBIT A - PAGE 007 | Code of Civil Procedure §§ 412.20, 465<br>*www.courtinfo.ca.gov*<br>*LexisNexis® Automated California Judicial Council Forms* |

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|

HELTON LAW GROUP, APC
7711 CENTER AVENUE, SUITE 350
HUNTINGTON BEACH, CA. 90647

TELEPHONE NO.: 562-901-4499    FAX NO. *(Optional):*
E-MAIL ADDRESS *(Optional):*
ATTORNEY FOR *(Name):*

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange

**02/24/2017** at 04:20:00 PM
Clerk of the Superior Court
By e Clerk,Deputy Clerk

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE
STREET ADDRESS: 700 CIVIC CENTER DRIVE WEST
MAILING ADDRESS:
CITY AND ZIP CODE: SANTA ANA, CA. 92701
BRANCH NAME: CENTRAL

PLAINTIFF/PETITIONER: ST. JOSEPH

DEFENDANT/RESPONDENT: PCM, INC.

CASE NUMBER:
30-2016-00894580

**PROOF OF SERVICE OF SUMMONS**

Ref. No. or File No.:

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.

2. I served copies of:
   a. [X] summons
   b. [X] complaint
   c. [X] Alternative Dispute Resolution (ADR) package
   d. [X] Civil Case Cover Sheet *(served in complex cases only)*
   e. [ ] cross-complaint
   f. [X] other *(specify documents):* NOTICE OF CASE ASSIGNMENT; NOTICE OF HEARING

3. a. Party served *(specify name of party as shown on documents served):* PCM, INC. WELFARE BENEFIT PLAN

   b. [X] Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*
   GLADYS AGUILERA, INTAKE CLERK AT CT CORP, AGENTS FOR SERVICE

4. Address where the party was served: 818 W. 7TH ST., SUITE 930, LOS ANGELES, CA. 90017

5. I served the party *(check proper box)*
   a. [X] **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date):* 2/23/17      (2) at *(time):* 11:15 AM
   b. [ ] **by substituted service.** On *(date):*      at *(time):*      I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3):*

      (1) [ ] **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.

      (2) [ ] **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

      (3) [ ] **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.

      (4) [ ] I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., § 415.20). I mailed the documents on *(date):*      from *(city):*      or [ ] a declaration of mailing is attached.

      (5) [ ] I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>POS-010 [Rev. January 1, 2007] | **PROOF OF SERVICE OF SUMMONS** | Legal<br>Solutions<br>ⓒ Plus | Code of Civil Procedure, § 417.10 |
|---|---|---|---|

EXHIBIT A - PAGE 008

| PLAINTIFF/PETITIONER: ST. JOSEPH | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: PCM, INC. | 30-2016-00894580 |

5. c. [ ] **by mail and acknowledgment of receipt of service.** I mailed the documents listed in Item 2 to the party, to the address shown in Item 4, by first-class mail, postage prepaid,

    (1) on *(date):*             (2) from *(city):*

    (3) [ ] with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed* Notice and Acknowledgement of Receipt.) *(Code Civ. Proc., § 415.30.)*

    (4) [ ] to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

  d. [ ] **by other means** *(specify means of service and authorizing code section):*

     [ ] Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:
  a. [ ] as an individual defendant.
  b. [ ] as the person sued under the fictitious name of *(specify):*
  c. [ ] as occupant.
  d. [X] On behalf of *(specify):* PCM, INC., WELFARE BENEFIT PLAN
    under the following Code of Civil Procedure section:

|  |  |
|---|---|
| [X] 416.10 (corporation) | [ ] 415.95 (business organization, form unknown) |
| [ ] 416.20 (defunct corporation) | [ ] 416.60 (minor) |
| [ ] 416.30 (joint stock company/association) | [ ] 416.70 (ward or conservatee) |
| [ ] 416.40 (association or partnership) | [ ] 416.90 (authorized person) |
| [ ] 416.50 (public entity) | [ ] 415.46 (occupant) |
|  | [ ] other: |

7. **Person who served papers**
  a. Name: JOE CLARK
  b. Address: 3454 E. ANAHEIM ST., LONG BEACH, CA. 90804
  c. Telephone number: 562-597-4088
  d. The fee for service was: $ 0.00
  e. I am:
    (1) [ ] not a registered California process server.
    (2) [ ] exempt from registration under Business and Professions Code section 22350(b).
    (3) [X] registered California process server:
      (i) [ ] owner [X] employee [ ] independent contractor.
      (ii) Registration No.: 6519
      (iii) County: LOS ANGELES

8. [X] I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

    or

9. [ ] I am a California sheriff or marshal and I certify that the foregoing is true and correct.

Date: 2/23/17

JOE CLARK
**(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)**

▶ *(signature)*
**(SIGNATURE )**

# HELTON LAW GROUP
**A PROFESSIONAL CORPORATION**
CARRIE MCLAIN (State Bar No. 181674)
KIM WOROBEC (State Bar No. 220035)
SARA A. POPOVICH (State Bar No. 306700)
ATTORNEYS AT LAW
7711 Center Ave., Suite 350
Huntington Beach, CA 92647
TELEPHONE: (562) 901-4499
FACSIMILE: (562) 901-4488

ATTORNEYS FOR PLAINTIFF ST. JOSEPH HOSPITAL OF ORANGE

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange

**12/27/2016** at 08:01:35 PM
Clerk of the Superior Court
By Alexander Morgan,Deputy Clerk

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF ORANGE

| | |
|---|---|
| ST. JOSEPH HOSPITAL OF ORANGE, a California Corporation,<br><br>Plaintiff,<br><br>vs.<br><br>PCM, INC. WELFARE BENEFIT PLAN; and DOES 1 through 25, inclusive,<br><br>Defendants. | Case No: 30-2016-00894580-CU-BC-CJC<br>ASSIGNED TO:<br>DEPT.: Judge Craig Griffin<br><br>UNLIMITED – DAMAGES EXCEED $25,000<br><br>**COMPLAINT FOR DAMAGES FOR:**<br><br>1. **BREACH OF IMPLIED-IN-FACT CONTRACT**<br>2. **QUANTUM MERUIT**<br>3. **OPEN BOOK ACCOUNT**<br>4. **PROMISSORY ESTOPPEL**<br>5. **ESTOPPEL** |

TO ALL INTERESTED PARTIES AND THEIR ATTORNEYS OF RECORD:

1.     Defendants PCM Inc. Welfare Benefit Plan and Does 1 through 25 (collectively, the "Defendants") have failed to pay more than $567,193.02 in medical reimbursement owed to the Plaintiff St. Joseph Hospital of Orange, for medically necessary hospital care and services provided to one (1) Patient on seven (7) occasions.

## THE PARTIES

2.     Plaintiff ST. JOSEPH HOSPITAL OF ORANGE ("St. Joseph" or "Hospital") is a California corporation, with its principal place of business in the County of Orange, in the State of California. St. Joseph is a California licensed acute-care hospital and in good standing under the laws of California.

---

1
COMPLAINT
EXHIBIT A - PAGE 010

3.     Hospital is informed and believes that Defendant PCM, INC. WELFARE BENEFIT PLAN ("PCM") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in the city of El Segundo, County of Los Angeles, in the State of California. Hospital is informed and believes that Defendant PCM provides health care benefits to its enrollees and their beneficiaries.

4.     Hospital is unaware of the true names, identities, and capacities of Defendants sued herein as Does 1 through 25, inclusive, and each of them as based thereon, sues said Defendants by such fictitious names. When their true names and capacities are ascertained, Hospital will amend this complaint by inserting their true names and capacities herein. Hospital is informed and believes and thereon alleges that each of the fictitiously named defendants is responsible in some manner for the occurrences alleged herein, and that the Hospital's damages as alleged herein were proximately caused by those defendants.

5.     Defendant PCM and Does 1 through 25 are collectively referred to herein as "Defendant" and/or "Defendants."

6.     Hospital is informed and believes and thereon alleges that at all times mentioned herein, each of the Defendants, including all Defendants sued under fictitious names, were the agent and/or employee of each of the remaining Defendants, and in so doing the things alleged herein, were acting within the scope of his or her agency and employment.

7.     Hospital is withholding the full name of the Patients in this Complaint to preserve the Patient's protected rights to privacy concerning health care information. Information identifying the Patient has been and will be made available to Defendant upon request.

8.     The Hospital is informed and believes, and on that basis alleges that, throughout the multiple dates of service during which the Hospital provided health care services to the Patients they were enrollees of the Defendant's health plan.

9.     Jurisdiction is proper in this judicial district because this is where the contracts at issue were entered into and/or where the breach occurred.

///

///

## GENERAL ALLEGATIONS

10.     As required by the laws of the State of California, at all times relevant herein, the Hospital was required to, and in fact did, publish its charges online on the OSHPD website. The Hospital's published charges are, and were at all times relevant here, available to the public including Defendant. The Hospital's published charges reflect the reasonable and customary value of the services and supplies the Hospital provides.

11.     It is custom and practice in the healthcare industry for health care providers such as the Hospital and health plans such as Defendant to enter into written contracts wherein the plans agree to encourage their members to use the Hospital for their medical needs and in exchange the Hospital agrees to accept payment at a discount off the full charge of its rates as published online on the OSHPD website.

12.     It is custom and practice in the healthcare industry that where a hospital and a health plan have not entered into a valid written contract, no other rate is set by law, and said hospital treats a member of said health plan, the health plan will pay the facility's full billed charges, which are published online on the OSHPD website, as said charges are the reasonable and customary rate for said services.

13.     The Hospital is informed and believes that, at all relevant times, Defendant has known what the Hospital's full billed charges are. The Hospital is informed and believes that, at all relevant times, Defendant also has been aware that, in the absence of a contract, letter of agreement or rate set by law, the Hospital expects reimbursement from a health plan at the facility's full billed charges.

## THE PATIENT AT ISSUE

14.     The Patient was a 59-year old woman who had breast cancer that spread to the lymph nodes of head, face, neck, axilla, and upper arms.

15.     During prior dates of service, which are not at issue in this litigation, the Patient received health care services from St. Joseph. The Patient presented information indicating she had health insurance through Defendant and that United Healthcare (UHC) was the administrator of such plan.

16. For such prior dates of service, which are not at issue in this litigation, St. Joseph submitted to the Defendant, by submitting the claims to UHC, claims for reimbursement for the services provided to the Patient. Defendant thus caused St. Joseph to believe that UHC was Defendant's authorized and/or ostensible agent by issuing membership identification cards and other records identifying UHC as the administrator, directing St. Joseph to contact UHC to obtain authorization, and provided private information regarding the Patient, such as the Patient's name and date of birth, that UHC would not have had if it were not such an agent.

## A.   FIRST UNDERPAID CLAIM AT ISSUE – OUTPATIENT PET SCAN

17. The Hospital is informed and believes and on that basis alleges that, at the recommendation of the Patient's treating physician, the Patient planned to undergo tumor imaging including through a positron emission tomography (PET) scan.

18. On December 2, 2014, St. Joseph contacted UHC through an online web portal. The Hospital is informed and believes and on that basis alleges that, because of St. Joseph's prior experiences with Defendant and UHC on prior dates of service for the Patient, St. Joseph understood UHC to be the administrator of the Patient's health insurance plan through Defendant for purposes of the outpatient visit that would include PET scan.

19. The Hospital is informed and believes and on that basis alleges that, Defendant caused the Hospital to believe that UHC was the actual and/or ostensible agent of Defendant in engaging in such communications and taking such actions because Defendant issued a membership identification card and other records identifying UHC as the administrator of the Patient's plan, directed St. Joseph to contact UHC to obtain authorization, and provided private information regarding the Patient, such as the Patient's name and date of birth, that UHC would not have had if it were not such an agent.

20. On December 2, 2014, through the web portal, UHC issued to St. Joseph authorization number CC62055908 for the PET services to be provided to the Patient. UHC further informed St. Joseph that the Patient had no financial liability for such services.

21. In reliance on this information, St. Joseph proceeded in providing services to the Patient, including a PET scan, with total charges of $9,143.50.

22.     St. Joseph originally submitted the claim for reimbursement to UHC ("Claim 1") and anticipated that the services would be reimbursed according to St. Joseph's written contract with UHC. On December 24, 2014, on behalf of Defendant, UHC denied payment on the claim, stating "expenses incurred after coverage terminated."

23.     St. Joseph is informed and believes and thereon alleges that, as of November 30, 2014, PCM terminated its administrative services agreement with UHC.

24.     Thereafter, the Hospital then billed Defendant for the services provided to the Patient.

25.     On or about May 15, 2015, Defendant issued payment to the Hospital in the amount of $1,810.30, which is less than the amount due under St. Joseph's written contract with UHC.

26.     In issuing such payment, Defendant sent an Explanation of Benefits ("EOB") to the Hospital stating that Defendant pays "100%." In the EOB, Defendant did not identify any amount as patient responsibility.

27.     In the EOB, Defendant improperly identified $7,333.20 as "ineligible" charges, along with the explanation, "These charges exceed the plan's allowable claim limits. Therefore, the charges have been denied as stated in the exclusions and limitations in your summary plan description."

28.     St. Joseph submitted letters to Defendant disputing the underpayment and Defendant's failure to identify any alleged noncovered balance as patient responsibility.

**B.     SECOND UNDERPAID CLAIM AT ISSUE – EMERGENCY ROOM VISIT**

29.     In January 2015, the Patient presented to the Hospital's Emergency Room ("ER") for treatment of shortness of breath and stridor.

30.     The Hospital provided the Patient medically-necessary and physician-ordered emergency services with total charges of $2,471.38.

31.     The Hospital promptly billed Defendant for the medical services the Hospital provided to the Patient. ("Claim 2")

32.     On or about January 28, 2015, Defendant issued payment to the Hospital in the amount of $661.11.

33. With such payment, Defendant sent an Explanation of Benefits ("EOB") to the Hospital stating that Defendant pays "100%." In the EOB, Defendant did not identify any amount as patient responsibility.

34. In the EOB, Defendant improperly identified $1,810.27 as "ineligible" charges, along with the explanation, "These charges exceed the plan's allowable claim limits. Therefore, the charges have been denied as stated in the exclusions and limitations in your summary plan description."

35. St. Joseph submitted letters to Defendant disputing the underpayment and Defendant's failure to identify any alleged noncovered balance as patient responsibility.

**C.  THIRD UNDERPAID CLAIM AT ISSUE – OUTPATIENT ECHOCARDIOGRAM**

36. In February 2015, the Patient presented to the Hospital for an echocardiogram to treat a mitral valve disorder.

37. The Hospital is informed and believes and on that basis alleges that Defendant pre-authorized the services the Hospital provided the Patient.

38. The total charges for such medically necessary and physician ordered services the Hospital provided to the Patient were $3,907.56.

39. The Hospital promptly billed Defendant for the medical services the Hospital provided to the Patient. ("Claim 3")

40. On or about March 4, 2015, Defendant issued an EOB to the Hospital which identified the Patient as being financially responsible for a $582.70, as part of her deductible. In the EOB, Defendant did not identify any additional amount as patient responsibility.

41. In the EOB, which was addressed to the Hospital, Defendant improperly identified $3,324.86 as "ineligible" charges, along with the explanation, "These charges exceed the plan's allowable claim limits. Therefore, the charges have been denied as stated in the exclusions and limitations in your summary plan description."

42. St. Joseph submitted letters to Defendant disputing the underpayment and Defendant's failure to identify any alleged noncovered balance as patient responsibility.

1  **D.      FOURTH UNDERPAID CLAIM AT ISSUE – ER-to-INPATIENT ADMISSION**

2          43.     In February 2015, the Patient presented to the Hospital's ER and then was admitted for

3  treatment of septicemia, bronchopneumonia and collapsed lung.  In addition to breast and lymph

4  nodes, by this point, the cancer had metastasized to the Patient's bone and bone marrow.

5          44.     Shortly following the Patient's stabilization, the Hospital contacted Defendant to

6  confirm eligibility and coverage through Defendant's Plan and to request Defendant's authorization of

7  the Hospital's provision of services to the Patient.

8          45.     Defendant confirmed the Patient's eligibility and coverage for the Hospital's services

9  through the Defendant's Plan.

10          46.     Defendant requested that the Hospital send Defendant clinical information regarding

11  the Patient, and Hospital sent such information.  Specifically, during the Patient's ten-day inpatient

12  hospital stay (with discharge on the eleventh day), the Hospital sent Defendant ten separate faxes with

13  information regarding the Patient's clinical condition and health care services the Hospital provided.

14          47.     Although Defendant could have requested that the Patient be transferred to another

15  acute care hospital of Defendant's choice in order to secure more favorable financial terms or rates for

16  the services the Patient required, Defendant never requested that the Patient be transferred to any other

17  hospital.

18          48.     Ultimately, St. Joseph provided the Patient medically necessary and physician ordered

19  emergency and poststabilization services with total charges of $132,768.05.

20          49.     Defendant authorized all of the services the Hospital provided the Patient during the

21  ten-day inpatient acute care hospital stay.

22          50.     The Hospital promptly billed Defendant for the medical services the Hospital provided

23  to the Patient. ("Claim 4")

24          51.     On or about April 1, 2015, Defendant issued payment to the Hospital in the amount of

25  $37,486.55.

26          52.     In issuing such payment, Defendant issued an EOB to the Hospital stating that

27  Defendant pays "100%."  In the EOB, Defendant did not identify any amount as patient responsibility.

28

53.     In the EOB, which was addressed to the Hospital, Defendant improperly identified $95,281.50 as "ineligible" charges, along with the explanation, "These charges exceed the plan's allowable claim limits.   Therefore, the charges have been denied as stated in the exclusions and limitations in your summary plan description."

54.     St. Joseph submitted letters to Defendant disputing the underpayment and Defendant's failure to identify any alleged noncovered balance as patient responsibility.

**E.     FIFTH UNDERPAID CLAIM AT ISSUE – ER-to-INPATIENT ADMISSION**

55.     In March 2015, the Patient presented to the Hospital's ER and was admitted to the Hospital for treatment of acute respiratory failure and acute renal failure.   The Patient still had cancer that had metastasized in her lymph nodes, bone and breast.   During her admission, she underwent a tracheostomy and was placed on mechanical ventilation.

56.     Shortly following the Patient's stabilization, the Hospital contacted Defendant to confirm eligibility and coverage through Defendant's Plan and to request Defendant's authorization of the Hospital's provision of services to the Patient.

57.     On March 16, 2015, at approximately 10:57 p.m., Defendant sent to the Hospital by fax a letter (the "March 16, 2015 Letter") verifying the Patient's eligibility and coverage under the Plan.

58.     The March 16, 2015 Letter did not identify the name of any individual or position title for such employee or representative at Defendant who sent the Letter on behalf of Defendant. However, the Hospital is informed and believes and on that basis alleges that the March 16, 2015 Letter was sent by an authorized and/or ostensible agent of Defendant with Defendant's knowledge and consent because the March 16, 2015 Letter contains protected health information of the Patient that the authorized and/or ostensible agent of Defendant would not be entitled to have if not knowingly provided by Defendant because of such agency.

59.     The March 16, 2015 Letter verified the Patient's eligibility and coverage under the Plan.  Specifically, the March 16, 2015 Letter included the following language addressing the Plan's coverage for hospital services for the Patient, in pertinent part:

PLAN YEAR: 12/01 through 11/30

PLAN YR MAX: Unlimited

1    LEVEL I PLAN YR DED: $3,000 ...

2    **·includes Rx

3    CO/INS: 80%

4    OOP: $6,400 ...

5    **includes ded & rx

6    FAMILY DED : $3,000 ...

7    **includes Rx

8    FAMILY OOP: $6,400 ...

9    **includes ded & rx

10   LIFETIME MAX : Unlimited

11   60.    This letter further reported that the Patient had met her individual and family

12   deductibles and out of pocket maximums for the year.

13   61.    In the March 16, 2015 Letter, Defendant did not expressly disclose the existence of any

14   other exclusions or limitations applicable to the Defendant's coverage of the services the Hospital

15   provided to the Patient.

16   62.    Defendant requested that the Hospital send Defendant clinical information regarding

17   the Patient, and Hospital sent such information.  Specifically, over the Patient's nine-day inpatient

18   hospital stay, the Hospital sent six separate faxes with information regarding the Patient's clinical

19   condition and medical treatment and services received from the Hospital.

20   63.    Although Defendant could have requested that the Hospital and the Patient's treating

21   physicians transfer the Patient to another acute care hospital of Defendant's choice in order to secure

22   more favorable financial terms or rates for the services the Patient required, Defendant never

23   requested that the Patient be transferred to any other facility.

24   64.    Ultimately, Defendant authorized all of the services the Hospital provided the Patient

25   during the nine-day inpatient acute care hospital stay.

26   65.    The total charges for services the Hospital provided to the Patient during this ER-to-

27   inpatient admission were $198,667.50.

28

66.     The Hospital promptly billed Defendant for the medical services the Hospital provided to the Patient. ("Claim 5")

67.     On or about May 6, 2015, Defendant issued two payments to the Hospital in the total amount of $58,226.39.

68.     In issuing such payments, Defendant issued EOBs to the Hospital both stating that Defendant pays "100%." Defendant did not identify any amounts as patient responsibility in either of these two EOBs.

69.     In the EOB, which was addressed to the Hospital, Defendant improperly identified $140,441.11 as "ineligible" charges with the explanation, "These charges exceed the plan's allowable claim limits. Therefore, the charges have been denied as stated in the exclusions and limitations in your summary plan description."

70.     St. Joseph submitted letters to Defendant disputing the underpayment and Defendant's failure to identify any alleged noncovered balance as patient responsibility.

**F.    SIXTH UNDERPAID CLAIM AT ISSUE – ER-to-INPATIENT ADMISSION**

71.     In October 2015, the Patient presented to the Hospital's ER and was admitted as an inpatient for treatment of sepsis, cerebral edema, pneumonitis due to inhalation of food and vomit, and encephalopathy. By this time, the Patient's cancer metastasized to her brain.

72.     Following stabilization, the Hospital contacted Defendant to verify the Patient's eligibility and coverage through the Defendant.

73.     On October 27, 2015, at approximately 9:54 p.m., Defendant sent to the Hospital by fax a letter (the "October 27, 2015 Letter") verifying the Patient's eligibility and coverage under the Plan.

74.     The October 27, 2015 Letter did not identify the name of any individual or position title for such employee or representative at Defendant who sent the Letter on behalf of Defendant. However, the Hospital is informed and believes and on that basis alleges that the October 27, 2015 Letter was sent by an authorized and/or ostensible agent of Defendant with Defendant's knowledge and consent because the October 27, 2015 Letter contains protected health information of the Patient

1  that the authorized and/or ostensible agent of Defendant would not be entitled to have if not
2  knowingly provided by Defendant because of such agency.

3      75.    The October 27, 2015 Letter verified the Patient's eligibility and coverage under the
4  Plan. The Hospital is informed and believes and, on this basis alleges that, the October 27, 2015
5  Letter included the following language addressing the Plan's coverage for hospital services for the
6  Patient, in pertinent part:

7          PLAN YEAR: 12/01 through 11/30

8          PLAN YR MAX: Unlimited

9          LEVEL I PLAN YR DED: $3,000 (combined with Level II ppo ded)

10          **·includes Rx

11          CO/INS: 80%

12          OOP: $6,400 ...

13          **includes ded & rx

14          FAMILY DED : $3,000 ...

15          **includes Rx

16          FAMILY OOP: $6,400 ...

17          **includes ded & rx

18          LIFETIME MAX : Unlimited

19      76.    This letter further reported that the Patient had met her individual and family
20  deductibles and out of pocket maximums for the year.

21      77.    The Hospital is informed and believes and, on this basis alleges that, in the October 27,
22  2015 Letter, Defendant did not expressly disclose the existence of any other exclusions or limitations
23  applicable to the Defendant's coverage of the services the Hospital provided to the Patient.

24      78.    Although Defendant could have requested that the Hospital and the Patient's treating
25  physicians transfer the Patient to another acute care hospital of Defendant's choice in order to secure
26  more favorable financial terms or rates for the services the Patient required, Defendant never
27  requested that the Patient be transferred to any other facility.

28

79.     Ultimately, Defendant authorized all of the services the Hospital provided the Patient during the ten-day inpatient acute care hospital stay.

80.     The total charges for services the Hospital provided to the Patient during this ER-to-inpatient admission were $191,008.65.

81.     The Hospital promptly billed Defendant for the medical services the Hospital provided to the Patient. ("Claim 6")

82.     On or about February 3, 2016, Defendant issued a payment to the Hospital in the amount of $49,554.05.

83.     In issuing such payment, Defendant issued an EOB to the Hospital stating that Defendant pays "100%." In the EOB, Defendant did not identify any amounts as patient responsibility.

84.     In the EOB, which was addressed to the Hospital, Defendant improperly identified $141,454.60 as "ineligible" charges with the explanation, "These charges exceed the plan's allowable claim limits. Therefore, the charges have been denied as stated in the exclusions and limitations in your summary plan description."

85.     St. Joseph submitted letters to Defendant disputing the underpayment and Defendant's failure to identify any alleged noncovered balance as patient responsibility.

G.     **SEVENTH UNDERPAID CLAIM AT ISSUE – ER-to-INPATIENT ADMISSION**

86.     In November 2015, the Patient presented to the Hospital's ER and was admitted for treatment of sepsis, cerebral edema, pneumonitis due to inhalation of food and vomit, and encephalopathy.

87.     Following stabilization, the Hospital contacted Defendant to verify the Patient's eligibility and coverage through the Defendant.

88.     On November 16, 2015, the Hospital's representative I. Perez called Defendant at (866) 206-3224 and spoke with Defendant's representative Ray. Ray verified the Patient's insurance coverage and stated that Defendant's plan covers 80%.

89.     Defendant requested that the Hospital send Defendant clinical information regarding the Patient, and Hospital sent such information.

90.     Although Defendant could have requested that the Hospital and the Patient's treating physicians transfer the Patient to another acute care hospital of Defendant's choice in order to secure more favorable financial terms or rates for the services the Patient required, Defendant never requested that the Patient be transferred to any other facility.

91.     Ultimately, Defendant authorized all of the services the Hospital provided the Patient during the eleven-day inpatient acute care hospital stay (with discharge on the twelfth-day).

92.     The total charges for services the Hospital provided to the Patient during this ER-to-inpatient admission were $261,526.72.

93.     The Hospital promptly billed Defendant for the medical services the Hospital provided to the Patient. ("Claim 7")

94.     On or about February 3, 2016, Defendant issued a payment to the Hospital in the amount of $83,979.24.

95.     In issuing such payment, Defendant issued an EOB to the Hospital stating that Defendant pays "100%."   In the EOB, Defendant did not identify any amounts as patient responsibility.

96.     In the EOB, which was addressed to the Hospital, Defendant improperly identified $177,547.48 as "ineligible" charges with the explanation, "These charges exceed the plan's allowable claim limits.  Therefore, the charges have been denied as stated in the exclusions and limitations in your summary plan description."

97.     St. Joseph submitted letters to Defendant disputing the underpayment and Defendant's failure to identify any alleged noncovered balance as patient responsibility.

## FIRST CAUSE OF ACTION

### BREACH OF IMPLIED-IN-FACT CONTRACT

### (AGAINST ALL DEFENDANTS)

98.     The Hospital hereby re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs above, and further alleges as follows.

99.     The Hospital is informed and believes and, on this basis alleges that, prior to and/or at the time of providing such services in connection with Claims 1 and 3-7, the Hospital contacted

---

13

1  Defendant to request authorization for the services the Hospital provided to each of the Patients, and
2  Defendant responded by authorizing such services.

3       100.    Defendant did not assert that the Patient was not their insured, or indicate in any way to
4  the Hospital they would not cover the Patient medical expenses.

5       101.    The Hospital reasonably understood the actions and communications by Defendant
6  with respect to Claims 1 and 3-7 to constitute express and/or implied requests that the Hospital
7  provide services to the Patient and an agreement by Defendant to pay the Hospital for such requested
8  services.

9       102.    Defendant's conduct gave rise to implied-in-fact agreements between the Hospital and
10  Defendants obligating Defendant to pay for the care and treatment rendered by the Hospital to the
11  Patient as to Claims 1 and 3-7.

12       103.    The Hospital performed all its obligations under its implied-in-fact contracts with
13  Defendant in that it cared for and treated the Patients to the best of the Hospital's ability.

14       104.    The Hospital and Defendants never reached an agreement as to the rate of payment;
15  therefore, a reasonable rate of payment shall be implied.

16       105.    The Hospital timely submitted to Defendant claims for reimbursement for the services
17  provided to the Patient as to Claims 1 and 3-7.

18       106.    Defendant acknowledged their contractual obligations to the Hospital through
19  communications and correspondence, including but not limited to issuing partial payment on such
20  claims.  However, Defendant failed to fully reimburse the Hospital for the services rendered to the
21  Patients at a reasonable rate.

22       107.    Defendants thus breached their implied-in-fact agreements with the Hospital.

23       108.    As a result, the Hospital has been damaged in an amount not less than $565,382.75.

24                     **SECOND CAUSE OF ACTION**

25                          **QUANTUM MERUIT**

26                      **(AGAINST ALL DEFENDANTS)**

27       109.    The Hospital hereby re-alleges and incorporates by reference each and every allegation
28  set forth in the preceding paragraphs above, and further alleges as follows.

110.    As alleged above, the Hospital believes it is entitled to full and complete payment in accordance of its implied-in-fact contracts with Defendant. However, to the extent the implied-in-fact contacts alleged above do not apply and/or is deemed unenforceable, the Hospital alleges in the alternative that Defendant owes the Hospital for the services provided to the Patients in *quantum meruit*.

111.    The Hospital is informed and believes and, on this basis alleges that, prior to and/or at the time of providing such services in connection with Claims 1 and 3-7, it notified the Defendants that the Hospital would be and/or was providing the Patient medically necessary and physician-ordered hospital services.

112.    By verifying the Patient's benefits and authorizing the services or communicating that the Defendants would cover and pay for the services in connection with Claims 1 and 3-7, Defendants expressly and/or impliedly requested the Hospital to provide hospital services to the Patient.

113.    In response, the Hospital provided hospital services to the Patient.

114.    Defendants have not reimbursed the Hospital the reasonable value of the hospital services it provided to the Patient.  Thus, the Hospital has not been compensated for the significant health care services it provided to the Patient.

115.    As a result of the benefit conferred upon the Defendants at Defendants' express and/or implied requests, the Hospital is entitled to *quantum meruit* damages in an amount exceeding $565,382.75, to be proven at trial, for Claims 1 and 3-7.

## THIRD CAUSE OF ACTION

### OPEN BOOK ACCOUNT

### (AGAINST ALL DEFENDANTS)

116.    The Hospital re-alleges and incorporates by reference each and every allegation set forth in preceding paragraphs above.

117.    As alleged above, the Hospital believes it is entitled to full and complete payment from the Defendants in accordance with the implied-in-fact contracts as set forth above.  However, to the extent the implied-in-fact contract alleged does not apply and/or are deemed unenforceable against the

1    Defendants for any of the services at issue, the Hospital alleges in the alternative that the Defendants
2    owes the Hospital for these services based upon open book account.

3        118.    The Hospital seeks recovery from the Defendants in an amount to be proved at trial,
4    but in no event less than $567,193.02, based on an account stated in writing, plus interest.

5        119.    In the ordinary course of business, the Hospital sent invoices for the services at issue to
6    the place that the Defendants directed the Hospital to send those bills.   The bills are commonly
7    referred to as UB-04s, based on the form originated by the Medicare program, and now used routinely
8    by all providers and payors, for stating bills.   The amounts stated on these bills by the Hospital are the
9    billed charges and therefore full values for the care provided to the Patient.

10       120.    The Hospital further maintained the Defendants' open account for the services
11   provided to the Patient.   The open book account showed the account receivable – all debits and
12   credits – for all of the services provided.

13       121.    The Hospital is informed and believes that the Defendants agreed with the Hospital on
14   the amount due from it, as reflected in the UB-04s sent to Defendants.

15       122.    The Hospital is informed and believes that the Defendants expressly and/or impliedly
16   promised to pay the amount due of $799,493.36.   The Defendants only "allowed" – through
17   Defendants' own payments or by identifying as patient responsibility – a total of $232,300.34 and
18   now owe the Hospital a balance of $567,193.02 for the open book account.

19   **FOURTH CAUSE OF ACTION**

20   **PROMISSORY ESTOPPEL**

21   **(AGAINST ALL DEFENDANTS)**

22       123.    The Hospital re-alleges and incorporates by reference each and every allegation set
23   forth in preceding paragraphs above.

24       124.    As alleged above, the Hospital believes it is entitled to full and complete payment from
25   the Defendant in accordance with the implied-in-fact contracts as set forth above.   However, to the
26   extent the implied-in-fact contract alleged does not apply and/or are deemed unenforceable against the
27   Defendant for any of the services at issue, the Hospital alleges in the alternative that the Defendant
28   owes the Hospital for these services based upon promissory estoppel.

1      125.   Claim 1: On December 2, 2014, through the web portal, UHC, as Defendant's

2   ostensible agent, issued to the Hospital authorization number CC62055908 for the PET services to be

3   provided to the Patient, and informed the Hospital that the Patient had no financial liability for such

4   services.

5      126.   According to industry custom, UHC's issuance of the authorization indicated on

6   behalf of Defendant that the claim would be paid under the Hospital's contract with UHC, and led the

7   Hospital to expect payment from Defendant under the rates of such contract.

8      127.   In reasonable reliance on Defendant's promises, the Hospital thereafter provided the

9   Patient medically necessary services.

10      128.   Claim 2: During a subsequent ER visit, the Hospital provided emergency services to

11   the Patient with total billed charges of $2,471.38, which are the reasonable and customary charges for

12   such services.

13      129.   The Hospital billed Defendant for such emergency services. On or about January 28,

14   2015, Defendant issued payment to the Hospital in the amount of $661.11. With such payment,

15   Defendant sent an EOB to the Hospital stating that Defendant pays "100%" and identified the "Total

16   due to provider [as patient responsibility]" as "0.00."

17      130.   In reasonable reliance on Defendant's promises, the Hospital refrained from taking

18   other action, such as seeking additional payment from the Patient.

19      131.   Defendant should have reasonably expected the Hospital to have changed its position

20   in reliance on their promises.

21      132.   Claims 4-7:  In connection with Claims 4, 5, 6 and 7, the Hospital provided medically

22   necessary emergency and post-stabilization, inpatient services.

23      133.   On March 16, 2015 and October 27, 2015, Defendant faxed the Hospital letters

24   verifying eligibility and coverage stating that, after the Patient's individual deductible of $3,000,

25   Defendant's Plan pays 80% of the patient's medical expenses, and the patient pays 20% until she

26   meets the individual out of pocket maximum of $3,000 and family out of pocket maximum of $6,400;

27   Defendant further informed the Hospital in those faxes that the Patient had met her individual and

28

EXHIBIT A - PAGE 026

1   family deductibles and out of pocket maximums for the year, and thus the Patient would have no

2   patient responsibility.

3      134.    On November 16, 2015, during a telephone call, Defendant informed the Hospital that

4   Defendant's Plan paid 80% of the patient's medical expenses.

5      135.    Thereafter, in EOBs dates April 5, 2015 and May 6, 2015, and two separate EOBs

6   dated February 3, 2016, Defendant expressly stated that it paid 100% of the Patient's health care

7   services that the Hospital provided and that the Patient had no patient responsibility. However,

8   Defendant failed to fully pay the Hospital's claims for reimbursement.

9      136.    In reasonable reliance on Defendant's promises, the Hospital refrained from taking

10   other action, such as seeking to transfer the Patient to another facility who would accept Defendant's

11   financial terms or seeking additional payment from the Patient.

12      137.    Defendant should have reasonably expected the Hospital to have changed its position

13   in reliance on their promises.

14      138.    In sum, the Hospital provided the Patient health care services totaling $795,585.80.

15   Defendant has failed to fully compensate the Hospital and thus the Hospital has been damaged in an

16   amount to be proved at trial, but no less than $563,868.16.

17      139.    Justice requires that Defendant's promises be enforced.

18                  **FIFTH CAUSE OF ACTION**

19                        **ESTOPPEL**

20              **(AGAINST ALL DEFENDANTS)**

21      140.    The Hospital re-alleges and incorporates by reference each and every allegation set

22   forth in preceding paragraphs above.

23      141.    As alleged above, the Hospital believes it is entitled to full and complete payment

24   from the Defendant in accordance with the implied-in-fact contracts as set forth above. However, to

25   the extent the implied-in-fact contract alleged does not apply and/or are deemed unenforceable

26   against the Defendant for any of the services at issue, the Hospital alleges in the alternative that the

27   Defendant owes the Hospital for these services based upon estoppel.

28

COMPLAINT

142.  <u>Claim 1</u>: On December 2, 2014, Defendant, through the web portal operated by their ostensible agent, UHC, issued to the Hospital authorization number CC62055908 for the PET services to be provided to the Patient, and informed the Hospital that the Patient had no financial liability for such services.

143.  According to industry custom, Defendant's issuance of the authorization indicated that the claim would be paid under the Hospital's contract with UHC, and led the Hospital to expect payment from Defendant under the rates of such contract.

144.  In reasonable reliance on Defendant's promises, the Hospital thereafter provided the Patient medically necessary services.

145.  At the time the Hospital contacted Defendant, the Hospital was not aware that Defendant did not intend to pay for the services the Hospital provided to the Patient through the Hospital's contract with UHC.

146.  The Hospital is informed and believes and thereon alleges that Defendant intended the Hospital to rely on Defendant's authorization in order to provide services to the Patient.  The Hospital did in fact rely on this representation in providing services to the Patient.

147.  In reasonable reliance on Defendant's representation, the Hospital thereafter provided the Patient medically necessary services.  Defendant should have reasonably expected the Hospital to have changed its position in reliance on its representations.

148.  The Hospital provided the Patient health care services with total charges of $9,143.50. Defendant has paid only $1,810.30 and has identified no patient responsibility.

149.  The Hospital is entitled to additional reimbursement in an amount to be proved at trial, but no less than $2,253.07.

150.  Justice requires that Defendants' representations be enforced.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays for judgment as follows:

1.  For compensatory damages in an amount according to proof at trial;

2.  For the reasonable value of the services in quantum meruit;

1    3.     For interest pursuant to Cal. Civil Code § 3287;

2    4.     For costs and reasonable attorneys' fees to the extent allowed by law; and

3    5.     For such other and further relief as the Court deems just and proper.

4

5  DATED:  December 27, 2016         HELTON LAW GROUP, APC

6

7                         By:
                                CARRIE MCLAIN

8                                KIM WOROBEC
                                SARA A. POPOVICH

9                                Attorneys for Plaintiff
                                ST. JOSEPH HOSPITAL OF ORANGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

EXHIBIT A - PAGE 029

# PLAN DOCUMENT

# AND

# SUMMARY PLAN DESCRIPTION

# FOR

# PCM, INC.

# COST PLUS HSA/HDHP PLAN

## PCM, INC. WELFARE BENEFIT PLAN

### ESTABLISHMENT OF THE PLAN;
### ADOPTION OF THE PLAN DOCUMENT AND SUMMARY PLAN DESCRIPTION

It is the intention of the Plan Sponsor, **PCM, Inc.**, to hereby amend and restate the PCM, Inc. Welfare Benefit Plan, a program of benefits constituting a self-funded "Employee Welfare Benefit Plan" under the Employee Retirement Income Security Act of 1974 (ERISA) and any amendments thereto.

**Effective Date**
The Plan Document is effective as of the date first set forth below, and each amendment is effective as of the date set forth therein (the "Effective Date").

**Adoption of the Plan Document**
The Plan Sponsor, as the settlor of the Plan, hereby adopts this Plan Document as the written description of the Plan. This Plan Document represents both the Plan Document and the Summary Plan Description, which is required by the Employee Retirement Income Security Act of 1974, 29 U.S.C. et seq. ("ERISA"). This Plan Document amends and replaces any prior statement of the health care coverage contained in the Plan or any predecessor to the Plan.

**IN WITNESS WHEREOF**, the Plan Sponsor has executed, and the Claims Administrator has acknowledged, this Plan Document as of the Plan effective date shown herein.

Effective date of the Plan: **December 1, 2013**; Amended and restated effective: **December 1, 2014**

| | |
|---|---|
| _____ Date | _____ Date |
| **For Plan Sponsor:** | **For Claims Administrator:** |
| Brandon LaVerne, Chief Financial Officer | Kathy Enochs, Chief Operating Officer |
| PCM, Inc. | Group & Pension Administrators, Inc. |


# TABLE OF CONTENTS

GENERAL INFORMATION AND PURPOSE ...................................................................................... 3
INTRODUCTION.................................................................................................................................. 5
STATEMENT OF ERISA RIGHTS..................................................................................................... 10
FEDERAL LAWS ............................................................................................................................... 12
SCHEDULE OF BENEFITS .............................................................................................................. 21
ORGAN TRANSPLANT BENEFITS .................................................................................................. 29
PRESCRIPTION DRUG PLAN BENEFITS ....................................................................................... 32
UTILIZATION REVIEW (UR) PROGRAM.......................................................................................... 35
CASE MANAGEMENT....................................................................................................................... 36
DISEASE MANAGEMENT................................................................................................................. 36
MATERNITY SUPPORT PROGRAM ................................................................................................ 36
GPA NURSE NAVIGATOR$^{SM}$ ...................................................................................................... 37
PORTABILITY AND CREDITABLE COVERAGE .............................................................................. 38
COMPREHENSIVE MEDICAL BENEFITS........................................................................................ 39
MAJOR MEDICAL EXPENSE BENEFITS ........................................................................................ 42
MAJOR MEDICAL PLAN EXCLUSIONS AND LIMITATIONS .......................................................... 49
COORDINATION OF BENEFITS ...................................................................................................... 53
COORDINATION PROCEDURES...................................................................................................... 54
COORDINATION WITH MEDICARE ................................................................................................. 55
COORDINATION WITH AUTOMOBILE INSURANCE COVERAGE ................................................. 55
SUBROGATION AND REIMBURSEMENT PROVISIONS................................................................. 57
CLAIM REVIEW AND AUDIT PROGRAM......................................................................................... 60
PROCEDURES FOR CLAIMS AND APPEALS................................................................................. 62
          PROVIDER OF SERVICE APPEAL RIGHTS................................................................. 68
          EXTERNAL REVIEW OF ADVERSE BENEFIT DETERMINATIONS........................... 69
GENERAL PROVISIONS.................................................................................................................... 73
ELIGIBILITY FOR COVERAGE ........................................................................................................ 75
QUALIFIED MEDICAL CHILD SUPPORT ORDERS / PLACEMENT FOR ADOPTION............................ 77
EFFECTIVE DATE OF COVERAGE ................................................................................................. 78
EMPLOYEE AND DEPENDENT SPECIAL ENROLLMENT PERIODS ............................................. 79
ANNUAL OPEN ENROLLMENT PERIOD FOR THE WELFARE BENEFIT PLAN.................................... 81
LATE ENROLLEE .............................................................................................................................. 81
COVERAGE CHANGES..................................................................................................................... 82
TERMINATION OF COVERAGE ....................................................................................................... 83
COVERAGE DURING LEAVE OF ABSENCE................................................................................... 84
REHIRES/REINSTATEMENT OF COVERAGE ................................................................................ 85
REPLACEMENT OF GROUP MEDICAL COVERAGE ..................................................................... 86
FAMILY AND MEDICAL LEAVE (FMLA)........................................................................................... 87
CONTINUATION OF GROUP HEALTH COVERAGE (COBRA) ...................................................... 88
DEFINITIONS .................................................................................................................................... 93
APPENDIX I ....................................................................................................................................... 115

## GENERAL INFORMATION AND PURPOSE

This Plan Document describes the benefits for the Employees of PCM, Inc. This statement is required by the Employee Retirement Income Security Act of 1974 (ERISA) and provides important information regarding your rights under this law.

**Introduction and Purpose**
The Plan Sponsor has established the Plan for the benefit of Eligible Employees, in accordance with the terms and conditions described herein. Plan benefits may be self-funded through a benefit fund or a trust established by the Plan Sponsor and self-funded with contributions from Participants and/or the Plan Sponsor, or may be funded solely from the general assets of the Plan Sponsor. Participants in the Plan may be required to contribute toward their benefits.

The Plan Sponsor's purpose in establishing the Plan is to help offset, for Eligible Employees, the economic effects arising from a Non-occupational Injury or Illness. To accomplish this purpose, the Plan Sponsor must be cognizant of the necessity of containing health care costs through effective plan design, and of abiding by the terms of the Plan Document, to allow the Plan Sponsor to allocate the resources available to help those individuals participating in the Plan to the maximum feasible extent.

The purpose of this Plan Document is to set forth the terms and provisions of the Plan that provide for the payment or reimbursement of all or a portion of certain covered expenses for medical charges. The Plan Document is maintained by **PCM, Inc.** and may be inspected at any time during normal working hours by any Covered Person.

**Name of Plan**
PCM, Inc. Welfare Benefit Plan

**Plan Sponsor**
PCM, Inc.
8337 Green Meadows Drive N
Lewis Center, OH 43035
614-854-1399

**Plan Administrator**
PCM, Inc.
8337 Green Meadows Drive N
Lewis Center, OH 43035
614-854-1399

**Type of Plan**
Self-Funded Employee Welfare Benefit Plan

**Agent for Service of Legal Process**
**Legal Process may also be served on the Plan Administrator**
Robert Newton, Chief Corporate Counsel
PCM, Inc.
8337 Green Meadows Drive N
Lewis Center, OH 43035
614-854-1399

*PCM, Inc. Cost Plus HSA/HDHP Plan*
*Eff: 12/1/14*

## EXHIBIT B - PAGE 033

**Claims Administrator**
Group & Pension Administrators, Inc. (GPA)
Park Central 8
12770 Merit Drive, 2nd Floor, Suite 200
Dallas, Texas 75251
972-238-7900 ♦ 800-827-7223
The Plan Administrator has retained the services of the Claims Administrator to administer Claims under the Plan.

**Utilization Review Company**
GPA/HealthWatch
Group & Pension Administrators, Inc. Medical Cost Containment Services
Park Central 8
12770 Merit Drive, 2nd Floor, Suite 200
Dallas, Texas  75251
972-744-2486 ♦ 866-206-3224

**Regional Office of Employee Benefits Security Administration**
Employee Benefits Security Administration (EBSA)
Department of Labor
Dallas Regional Office
525 South Griffin Street, Rm 900
Dallas, Texas  75202-5025
972-850-4500 ♦ 866-444-EBSA (3272)
www.askebsa.dol.gov for electronic inquiries ♦ www.dol.gov/ebsa

**Plan Year**
The twelve (12) month period beginning December 1 and ending November 30 of the next Calendar Year

**Employer Tax ID Number**
95-4518700

**GPA Group Number**
H870738

**ERISA Number**
501

**Legal Entity; Service of Process**
The Plan is a legal entity.  Legal notice may be filed with, and legal process served upon, the Plan Administrator.

*PCM, Inc. Cost Plus HSA/HDHP Plan*
                                                    *Eff: 12/1/14*

## INTRODUCTION

**PCM, Inc.**, hereafter referred to as "Company," hereby amends and restates the PCM, Inc. Welfare Benefit Plan, a self-funded Employee Welfare Benefit Plan coming within the purview of the Employee Retirement Income Security Act of 1974 (ERISA), hereafter referred to as the "Plan." The Plan's benefits and administration expenses are paid directly from the Employer's general assets, and the rights and privileges of which shall pertain to Employees and their Dependents with respect to such Plan. The Plan is not insured. Contributions received from Covered Persons are used to cover Plan costs and are expended immediately. As such, when applicable, Federal law and jurisdiction preempt State law and jurisdiction.


### PLAN ADMINISTRATOR AND DESIGNATED DECISION MAKER

The Plan is administered by the Plan Administrator in accordance with the provisions of the Employee Retirement Income Security Act of 1974 (ERISA), as amended. An individual or entity may be appointed by the Plan Sponsor to be Plan Administrator and serve at the convenience of the Plan Sponsor. If the Plan Administrator resigns, dies, is otherwise unable to perform, is dissolved, or is removed from the position, the Plan Sponsor shall appoint a new Plan Administrator as soon as reasonably possible.

Notwithstanding any provisions of this Plan Document and Summary Plan Description to the contrary, the Plan Sponsor has the authority to, and hereby does, allocate certain Fiduciary responsibility to ELAP Services LLC (the Designated Decision Maker or "DDM"). The Fiduciary responsibility allocated to the DDM is limited to discretionary authority and ultimate decision-making authority with respect to any appeals of denied Claims, which shall be referred to the DDM by the Plan Administrator (the "Referred Appeals"). The Plan Sponsor has allocated additional Fiduciary responsibility to the DDM, limited to discretionary authority and ultimate decision-making authority with respect to the review and audit of certain Claims in accordance with the applicable Plan provisions under the section, "Claim Review and Audit Program". Such Claims selected as eligible for review and audit shall be identified by the DDM under guidelines to which the Plan Sponsor has agreed, and shall be referred to the DDM by the Plan Administrator. The DDM shall have no authority, responsibility or liability other than with respect to the Referred Appeals and its duties under the Claim Review and Audit Program.

The Plan Administrator shall establish the policies, practices and procedures of this Plan. The Plan Administrator and the DDM shall administer this Plan in accordance with its terms. It is the express intent of this Plan that the Plan Administrator and the DDM shall have maximum legal discretionary authority to construe and interpret the terms and provisions of the Plan, to make determinations regarding issues which relate to eligibility for benefits (including the determination of which services, supplies, care and treatment are Experimental/Investigational), to decide disputes which may arise relative to a Covered Person's rights, and to decide questions of Plan interpretation and those of fact relating to the Plan. The decisions of the Plan Administrator and/or the DDM as to the facts related to any Claim for benefits and the meaning and intent of any provision of the Plan, or its application to any Claim, shall receive the maximum deference provided by law and will be final and binding on all interested parties. Benefits under this Plan will be paid only if the Plan Administrator or the DDM decides, in its discretion, that the Covered Person is entitled to them.


### DUTIES OF THE PLAN ADMINISTRATOR

The duties of the Plan Administrator include the following:

1. To administer the Plan in accordance with its terms;
2. To determine all questions of eligibility, status and coverage under the Plan;
3. To interpret the Plan, including the authority to construe possible ambiguities, inconsistencies, omissions and disputed terms;
4. To make factual findings;
5. To decide disputes which may arise relative to a Plan Participant's rights;

EXHIBIT B - PAGE 035

6.  To prescribe procedures for filing a Claim for benefits, to review Claim denials and appeals relating to them and to uphold or reverse such denials;
7.  To keep and maintain the Plan documents and all other records pertaining to the Plan;
8.  To appoint and supervise a third party administrator to pay Claims;
9.  To perform all necessary reporting as required by ERISA;
10. To ensure that the Plan is administered in accordance with applicable law;
11. To establish and communicate procedures to determine whether a Medical Child Support Order or national medical support notice is a QMCSO;
12. To delegate to any person or entity such powers, duties and responsibilities as it deems appropriate; and
13. To perform each and every function necessary for or related to the Plan's administration.

## DUTIES OF THE DESIGNATED DECISION MAKER

The DDM shall have the following duties with respect to the Referred Appeals:

1.  To administer the Plan in accordance with its terms;
2.  To determine all questions of eligibility, status and coverage under the Plan;
3.  To interpret the Plan, including the authority to construe possible ambiguities, inconsistencies, omissions and disputed terms;
4.  To make factual findings;
5.  To decide disputes which may arise relative to a Plan Participant's rights;
6.  To review Referred Appeals and to uphold or reverse any denials;
7.  To keep and maintain records pertaining to the Referred Appeals;
8.  To perform the duties in conjunction with the provisions of the Claim Review and Audit Program; and
9.  To keep and maintain records pertaining to the Claim Review and Audit Program.

The duties of the DDM shall be limited to those set forth above.

## PHYSICIAN-PATIENT RELATIONSHIP

The Plan is not intended to disturb the Physician-Patient relationship. Physicians and other healthcare Providers are not agents or delegates of the Plan Sponsor, Company, Plan Administrator, Employer or Claims Administrator. The delivery of medical and other healthcare services on behalf of any Covered Person remains the sole prerogative and responsibility of the attending Physician or other healthcare Provider.

## FREE CHOICE OF HOSPITAL AND PHYSICIAN

Nothing contained in this Plan shall in any way or manner restrict or interfere with the right of any person entitled to benefits hereunder to select a Hospital or to make a free choice of the attending Physician or professional Provider. However, benefits will be paid in accordance with the provisions of this Plan, and the Covered Person may have higher out-of-pocket expenses if the Covered Person uses the services of a Non-Preferred Provider Physician.

## PREFERRED PROVIDER INFORMATION

The Preferred Provider Network (PPO) does **not** include services and supplies provided by Hospital Facilities, Ambulatory Surgery Center Facilities and by dialysis clinics or Facilities. For these types of Providers, the Plan will identify the Reasonable cost for the services and supplies through its Claim Review and Audit Program. There is a section in this Summary Plan Description that fully describes the Claim Review and Audit Program, and the benefits for these Providers are described separately in Level I of the Schedule of Benefits. You may also contact the Claims Administrator or the Plan Administrator with any questions regarding which Facilities may be included under the Claim Review and Audit Program, and which may be included under the PPO network agreement.

6

*PCM, Inc. Cost Plus HSA/HDHP Plan
Eff: 12/1/14*

For Physicians and all other Providers of service, this Plan contains provisions under which a Plan Participant may receive more benefits by using certain Providers. There is a section in the Schedule of Benefits which describes the benefits for PPO and non-PPO Providers (Level II). PPO Providers are individuals and entities that have contracted with the Plan to provide services to Plan Participants at pre-negotiated rates. A list of these Preferred Providers can be accessed on the PPO website free of charge. In addition, a Plan Participant may request a Preferred Provider list by contacting the Plan Administrator. The Preferred Provider list changes frequently; therefore, it is recommended that a Plan Participant verify with the Provider that the Provider is still a Preferred Provider before receiving services. Please refer to the Plan Participant identification card for the PPO website address.

This plan may use Allowable Claim Limits to determine Covered Charges in lieu of a PPO discount.


## EFFECTIVE DATE

Effective date of the Plan: **December 1, 2013**; Amended and restated effective: **December 1, 2014**


## CLAIMS ADMINISTRATOR

The Claims Administrator of the Plan is shown in the General Information and Purpose section.


## NAMED FIDUCIARY

The named Fiduciary for purposes of applying the provisions of ERISA to the Plan is **PCM, Inc.**


## CONTRIBUTIONS TO THE PLAN

Contributions to the Plan are to be made on the following basis:

The Company shall from time to time evaluate the costs of the Plan and determine the amount to be contributed by the Employer and the amount to be contributed by each Covered Employee.

Notwithstanding any other provision of the Plan, the Company's obligation to pay Claims otherwise allowable under the terms of the Plan shall be limited to its obligation to make contributions to the Plan as set forth in the preceding paragraph. Payment of said Claims in accordance with these procedures shall discharge completely the Company's obligation with respect to such payments.

In the event that the Company or Board of Directors of the Company, if applicable, terminates the Plan, then as of the effective date of termination, the Employer and Covered Employees shall have no further obligation to make additional contributions to the Plan and the Plan shall have no obligation to pay Claims incurred after the termination date of the Plan.


## CLAIMS PROCEDURE

In accordance with Section 503 of ERISA, the Plan Administrator shall provide adequate notice in writing to any covered Plan Participant whose Claim for benefits under this Plan has been denied, setting forth the specific reasons for such denial and written in a manner calculated to be understood by the Plan Participant.  Further, the Plan Administrator shall afford a Reasonable opportunity to any Plan Participant, whose Claim for benefits has been denied, for a fair review of the decision denying the Claim by the person designated by the Plan Administrator for that purpose. Details of the Claims procedure, which are in compliance with ERISA regulations, are found in this Plan Document under the section entitled "Procedures for Claims and Appeals."

**PROTECTION AGAINST CREDITORS**

No benefit payment under this Plan shall be subject in any way to alienation, sale, transfer, pledge, attachment, garnishment, execution or encumbrance of any kind, and any attempt to accomplish the same shall be void. If the Plan Administrator shall find that such an attempt has been made with respect to any payment due or to become due to any Plan Participant, the Plan Administrator in its sole discretion may terminate the interest of such Plan Participant or former Plan Participant in such payment. And in such case the Plan Administrator shall apply the amount of such payment to or for the benefit of such Plan Participant or former Plan Participant, his/her spouse, parent, adult Child, guardian of a minor Child, brother or sister, or other relative of a Dependent of such Plan Participant or former Plan Participant, as the Plan Administrator may determine, and any such application shall be a complete discharge of all liability with respect to such benefit payment. However, at the discretion of the Plan Administrator, benefit payments may be assigned to health care Providers.

**AMENDING AND TERMINATING THE PLAN**

This Document contains all the terms of the Plan. The Plan Sponsor expects to maintain this Plan indefinitely; however, as the settlor of the Plan, the Plan Sponsor, through its directors and officers, may, in its sole discretion, at any time, amend, suspend or terminate the Plan in whole or in part. This includes amending the benefits under the Plan.

Any such amendment, suspension or termination shall be enacted, if the Plan Sponsor is a corporation, by written resolution of the Plan Sponsor's Board of Directors and officers, which shall be acted upon as provided in the Plan Sponsor's Articles of Incorporation or Bylaws, as applicable, and in accordance with applicable Federal and State law. Notice shall be provided as required by ERISA. In the event that the Plan Sponsor is a different type of entity, then such amendment, suspension or termination shall be taken and enacted in accordance with applicable Federal and State law and any applicable governing documents. In the event that the Plan Sponsor is a sole proprietorship, then such action shall be taken by the sole proprietor, in his own discretion.

If the Plan is terminated, the rights of the Covered Persons are limited to expenses incurred before termination. Previous contributions by the Employer shall continue to be used for the purpose of paying benefits under the provisions of this Plan with respect to Claims arising before such termination.

All amendments to this Plan shall become effective as of a date established by the Plan Sponsor and specified in the enabling resolution. Copies of all amendments shall be furnished by the Plan Administrator to the Trustees (if any) and any outside Provider of Plan administrative services.

**SUMMARY OF MATERIAL REDUCTION (SMR)**

A Material Reduction generally means any modification that would be considered by the average participant to be an important reduction in covered services or benefits. Examples include reductions in benefits or increases in Deductibles or copayments.

The Plan Administrator shall notify all Covered Employees of any Plan Amendment considered a Material Reduction in covered services or benefits provided by the Plan as soon as administratively feasible after its adoption, but no later than sixty (60) days after the date of adoption of the reduction. Covered Employees and beneficiaries must be furnished a summary of such reductions, and any changes so made shall be binding on each Covered Person. The sixty (60) day period for furnishing a summary of Material Reduction does not apply to any Employee covered by the Plan who would reasonably expect to receive a summary through other means within the next ninety (90) days.

Material Reduction disclosure provisions are subject to the requirements of ERISA and the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and any related amendments.

**SUMMARY OF MATERIAL MODIFICATIONS (SMM)**

A Summary of Material Modifications reports changes in the information provided within the Summary Plan Description. Examples include a change to Deductibles, eligibility or the addition or deletion of coverage.

The Plan Administrator shall notify all Covered Employees of any Plan Amendment considered a Summary of Material Modifications by the Plan as soon as administratively feasible after its adoption, but no later than within two hundred ten (210) days after the close of the Plan Year in which the changes became effective.

**PLAN IS NOT A CONTRACT**

This Plan Document constitutes the entire Plan. The Plan will not be deemed to constitute a contract of employment or give any Covered Employee the right to be retained in the service of the Employer or to interfere with the right of the Employer to discharge or otherwise terminate the employment of any Covered Employee.

## STATEMENT OF ERISA RIGHTS

As a Plan Participant in the Employee Welfare Benefit Plan you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA). ERISA provides that all Plan Participants shall be entitled to:

### RECEIVE INFORMATION ABOUT YOUR PLAN AND BENEFITS

Examine, without charge, at the Plan Administrator's office and at other specified locations, such as worksites and union halls, all documents governing the Plan, including insurance contracts and collective bargaining agreements, and a copy of the latest annual report (Form 5500 Series) filed by the Plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Employee Benefits Security Administration.

Obtain, upon written request to the Plan Administrator, copies of documents governing the operation of the Plan, including insurance contracts and collective bargaining agreements, and copies of the latest annual report (Form 5500 Series) and updated Summary Plan Description. The Plan Administrator may make a Reasonable charge for the copies.

To the extent required by ERISA to be prepared by the Plan, receive a summary of the Plan's annual financial report.  Plan Administrators are required by law to furnish Participants in certain plans with a copy of this summary annual report.

### CONTINUE GROUP HEALTH PLAN COVERAGE

Continue health care coverage for yourself, your spouse and/or your Dependents if there is a loss of coverage under the Plan as a result of a Qualifying Event. You or your Dependents may have to pay for such coverage. Review this Summary Plan Description and the documents governing the Plan on the rules governing your COBRA Continuation Coverage rights.

### PRUDENT ACTIONS BY PLAN FIDUCIARIES

In addition to creating rights for Plan Participants, ERISA imposes duties upon the people who are responsible for the operation of the Employee Welfare Benefit Plan. The people who operate the Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Plan Participants and beneficiaries. No one, including your Employer, your union, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit under the Plan or exercising your rights under ERISA.

### ENFORCE YOUR RIGHTS

If your Claim for a welfare benefit is denied or ignored, in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

Under ERISA, there are steps you can take to enforce the above rights.  For instance, if you request a copy of Plan documents or the latest annual report from the Plan and do not receive them within thirty (30) days, you may file suit in a Federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Plan Administrator.  If you have a Claim for benefits which is denied or ignored, in whole or in part, you may file suit in a State or Federal court. In addition, if you disagree with the Plan's decision or lack thereof concerning the qualified status of a domestic relations order or a Medical Child Support Order, you may file suit in Federal court. If it should happen that Plan fiduciaries misuse the Plan's money, or if you are discriminated against for

*PCM, Inc. Cost Plus HSA/HDHP Plan*
*Eff: 12/1/14*

asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a Federal court.  The court will decide who should pay court costs and legal fees.  If you are successful, the court may order the person you have sued to pay these costs and fees.  If you lose, the court may order you to pay these costs and fees, for example, if it finds your Claim or suit is frivolous.

## ASSISTANCE WITH YOUR QUESTIONS

If you have any questions about your Plan, you should contact the Plan Administrator.  If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from the Plan Administrator, you should contact the nearest office of the Employee Benefits Security Administration, U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue N.W., Washington, D.C. 20210. You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration.

## FEDERAL LAWS

Certain Federal laws apply to most group health programs. The following is an overview of the laws and their impact. The effect of these laws on the Plan is reflected in the provisions of the Plan. Should there be any conflict between the law and Plan provisions, the law will prevail.

### HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT OF 1996 (H.R. 3103, 1996)
The Health Insurance Portability and Accountability Act (HIPAA) amended ERISA and was enacted, among other things, to improve portability and continuity of health care coverage.

HIPAA also requires that Plan Participants and beneficiaries receive a summary of any change that is a "Material Reduction in covered services or benefits under a group health plan" within sixty (60) days after the adoption of the modification or change, unless the Plan Sponsor provides summaries of modifications or changes at regular intervals of ninety (90) days or less.

### PREGNANCY DISCRIMINATION ACT OF 1978
Most Employers must provide coverage for Pregnancy expenses in the same manner as coverage is provided for any other Illness. This requirement applies to Pregnancy expenses of an Employee or a covered Dependent spouse of an Employee.

### FAMILY AND MEDICAL LEAVE ACT OF 1993 (P.L. 103-3)
If a Covered Employee ceases active employment due to an Employer-approved Family Medical Leave of Absence in accordance with the requirements of Public Law 103, coverage availability will continue under the same terms and conditions which would have applied had the Employee continued in active employment. Contributions will remain at the same Employer/Employee levels as were in effect on the date immediately prior to the leave (unless contribution levels change for other Employees in the same classification).

### OMNIBUS BUDGET RECONCILIATION ACT OF 1993 (OBRA 1993: PL 103-66)
OBRA 1993 requires that an eligible Dependent Child of an Employee will include a Child who is adopted by the Employee or placed with him for adoption prior to age eighteen (18) and a Child for whom the Employee or covered Dependent spouse is required to provide coverage due to a Medical Child Support Order (MCSO) which is determined by the Plan Sponsor to be a Qualified Medical Child Support Order (QMCSO). A QMCSO will also include a judgment, decree or order issued by a court of competent jurisdiction or through an administrative process established under State law and having the force and effect of law under State law and which satisfies the QMCSO requirements of ERISA (section 609(a)). Participants may obtain a copy of the QMCSO procedures from the Plan Sponsor or Plan Administrator without charge.

### NEWBORNS' AND MOTHERS' HEALTH PROTECTION ACT OF 1996
The Newborns' and Mothers' Health Protection Act of 1996 establishes restrictions on the extent to which group health plans and health insurance issuers may limit the length of stay for mothers and newborn Children following delivery, as follows:

#### Statement of Rights under the Newborns' and Mothers' Health Protection Act
"Under Federal law, group health plans and health insurance issuers offering group health insurance coverage generally may not restrict benefits for any Hospital length of stay in connection with childbirth for the mother or newborn Child to less than forty-eight (48) hours following a vaginal delivery, or less than ninety-six (96) hours following a delivery by cesarean section. However, the plan or issuer may pay for a shorter stay if the attending Provider (i.e., your Physician, Nurse Midwife, or Physician Assistant), after consultation with the mother, discharges the mother or newborn earlier."

*PCM, Inc. Cost Plus HSA/HDHP Plan*
*Eff: 12/1/14*

Also, under Federal law, plans and issuers may not set the level of benefits or out-of-pocket costs so that any later portion of the forty-eight (48) hour or ninety-six (96) hour stay is treated in a manner less favorable to the mother or newborn than any earlier portion of the stay.

In addition, a plan or issuer may not, under Federal law, require that a Physician or other health care Provider obtain authorization for prescribing a length of stay of up to forty-eight (48) or ninety-six (96) hours. However, to use certain Providers or Facilities, or to reduce your out-of-pocket costs, you may be required to give notification. For information on notification, contact your Plan Administrator.

## WOMEN'S HEALTH AND CANCER RIGHTS ACT OF 1998

If you are receiving covered benefits for a mastectomy, you should know that your Plan complies with the Women's Health and Cancer Rights Act of 1998. The Act provides for:

1. Reconstruction of the breast(s) on which a covered mastectomy has been performed;
2. Surgery and reconstruction of the other breast to produce a symmetrical appearance; and
3. Prostheses and physical complications related to all stages of covered mastectomy, including lymphedema.

All applicable benefit provisions still apply, including existing Deductibles, Copays and/or Coinsurance.

## GENETIC INFORMATION NONDISCRIMINATION ACT OF 2008 ("GINA")

GINA prohibits the group health Plan from:

1. Adjusting premiums or contribution amounts for the group as a whole on the basis of Genetic Information.

2. Requesting or requiring an individual or a Family member to undergo a genetic test. However, subject to certain conditions, the Plan may request that an individual voluntarily undergo a genetic test as part of a research study as long as the results are not used for underwriting purposes.

3. Requesting, requiring or purchasing Genetic Information for underwriting purposes (which includes eligibility rules or determinations, computation of premium or contribution amounts and other activities related to the creation, renewal or replacement of coverage). The Plan is also prohibited from requesting, requiring or purchasing Genetic Information with respect to any individual prior to such individual's enrollment under the Plan or coverage. However, if the Plan obtains Genetic Information incidental to the collection of other information prior to enrollment, it will not be in violation of GINA as long as it is not used for underwriting purposes.

GINA allows the group health Plan to obtain and use the results of genetic tests for purposes of making payment determinations.

### What is "Genetic Information" under GINA?

Under GINA, the term "Genetic Information" includes:

1. Information about an individual or his/her Family member's genetic tests (defined as analyses of the individual's DNA, RNA, chromosomes, proteins, or metabolites that detect genotypes, mutations or chromosomal changes);

2. The manifestation of a Disease or disorder in the Family members of the individual. Family members are broadly defined under GINA to include individuals who are Dependents, as well as any other first, second, third or fourth degree relative. Further, Genetic Information includes that information of any fetus or embryo carried by a pregnant woman; and

3. Information obtained through genetic services (that is genetic tests, genetic counseling or genetic education) or participation in clinical research that includes genetic services.

Genetic Information does not include the sex or age of an individual.

**MENTAL HEALTH PARITY AND ADDICTION EQUITY ACT OF 2008 (MHPAEA)**
The Mental Health Parity and Addiction Equity Act requires that, if a group health plan provides coverage for mental health conditions or for substance use disorders, benefits for such conditions must be provided in the same manner as benefits for any Illness. Also, the Plan may not have separate cost-sharing arrangements that apply only to mental health or substance use disorder benefits.

**MEDICAID AND THE CHILDREN'S HEALTH INSURANCE PROGRAM (CHIP) OFFER FREE OR LOW-COST HEALTH COVERAGE TO CHILDREN AND FAMILIES**
If you are eligible for health coverage from your Employer, but are unable to afford the premiums, some States have premium assistance programs that can help pay for coverage. These States use funds from their Medicaid or CHIP programs to help people who are eligible for Employer-sponsored health coverage, but need assistance in paying their health premiums. If you or your Children aren't eligible for Medicaid or CHIP, you won't be eligible for these premium assistance programs but you may be able to buy individual insurance coverage through the Health Insurance Marketplace. For more information, visit www.healthcare.gov.

If you or your Dependents are already enrolled in Medicaid or CHIP and you live in a State listed below, you can contact your State Medicaid or CHIP office to find out if premium assistance is available.

If you or your Dependents are NOT currently enrolled in Medicaid or CHIP, and you think you or any of your Dependents might be eligible for either of these programs, you can contact your State Medicaid or CHIP office or dial **1-877-KIDS NOW** or **www.insurekidsnow.gov** to find out how to apply. If you qualify, you can ask the State if it has a program that might help you pay the premiums for an Employer-sponsored plan.

Once it is determined that you or your Dependents are eligible for premium assistance under Medicaid or CHIP, your Employer's health plan is required to permit you and your Dependents to enroll in the Plan - as long as you and your Dependents are eligible, but not already enrolled in the Employer's Plan. This is called a "Special Enrollment" opportunity, and **you must request coverage within sixty (60) days of being determined eligible for premium assistance.**

**If you live in one of the following States, you may be eligible for assistance to pay your Employer health premiums. The following list of States is current as of January 31, 2014. You should contact your State for further Information on eligibility:**

**ALABAMA** - Medicaid
Website: http://www.medicaid.alabama.gov
Phone: 1-855-692-5447

**ALASKA** - Medicaid
Website: http://health.hss.state.ak.us/dpa/programs/medicaid/
Phone (Outside of Anchorage): 1-888-318-8890
Phone (Anchorage): 1-907-269-6529

**ARIZONA** - CHIP
Website: http://www.azahcccs.gov/applicants
Phone (Outside of Maricopa County): 1-877-764-5437
Phone (Maricopa County): 1-602-417-5437

**COLORADO** - Medicaid
Medicaid Website: http://www.colorado.gov/
Medicaid Phone (In state): 1-800-866-3513
Medicaid Phone (Out of state): 1-800-221-3943

**FLORIDA** - Medicaid
Website: https://www.flmedicaidtplrecovery.com/
Phone: 1-877-357-3268

*PCM, Inc. Cost Plus HSA/HDHP Plan*
*Eff: 12/1/14*

**GEORGIA** - Medicaid
Website: http://dch.georgia.gov/
Click on Programs, then Medicaid, then Health Insurance Premium Payment (HIPP)
Phone: 1-800-869-1150

**IDAHO** - Medicaid
Medicaid Website:
http://healthandwelfare.idaho.gov/Medical/Medicaid/PremiumAssistance/tabid/1510/Default.aspx
Medicaid Phone: 1-800-926-2588

**INDIANA** - Medicaid
Website: http://www.in.gov/fssa
Phone: 1-800-889-9949

**IOWA** - Medicaid
Website: www.dhs.state.ia.us/hipp/
Phone: 1-888-346-9562

**KANSAS** - Medicaid
Website: http://www.kdheks.gov/hcf/
Phone: 1-800-792-4884

**KENTUCKY** - Medicaid
Website: http://chfs.ky.gov/dms/default.htm
Phone: 1-800-635-2570

**LOUISIANA** - Medicaid
Website: http://www.lahipp.dhh.louisiana.gov
Phone: 1-888-695-2447

**MAINE** - Medicaid
Website: http://www.maine.gov/dhhs/ofi/public-assistance/index.html
Phone: 1-800-977-6470
TTY: 1-800-977-6741

**MASSACHUSETTS** - Medicaid and CHIP
Medicaid and CHIP Website: http://www.mass.gov/MassHealth
Medicaid and CHIP Phone: 1-800-462-1120

**MINNESOTA** - Medicaid
Website: http://www.dhs.state.mn.us/
Click on Health Care, then Medical Assistance
Phone: 1-800-657-3629

**MISSOURI** - Medicaid
Website: http://www.dss.mo.gov/mhd/participants/pages/hipp.htm
Phone: 1-573-751-2005

**MONTANA** - Medicaid
Website: http://medicaidprovider.hhs.mt.gov/clientpages/clientindex.shtml
Phone: 1-800-694-3084

**NEBRASKA** - Medicaid
Website: www.ACCESSNebraska.ne.gov
Phone: 1-800-383-4278

**NEVADA** - Medicaid
Website: http://dwss.nv.gov/
Phone: 1-800-992-0900

**NEW HAMPSHIRE** - Medicaid
Website: www.dhhs.nh.gov/oii/documents/hippapp.pdf
Phone: 1-603-271-5218

**NEW JERSEY** - Medicaid and CHIP
Medicaid Website: http://www.state.nj.us/humanservices/dmahs/clients/medicaid/
Medicaid Phone: 1-609-631-2392
CHIP Website: http://www.njfamilycare.org/index.html
CHIP Phone: 1-800-701-0710

**NEW YORK** - Medicaid
Website: http://www.nyhealth.gov/health_care/medicaid/
Phone: 1-800-541-2831

**NORTH CAROLINA** - Medicaid
Website: http://www.ncdhhs.gov/dma
Phone: 1-919-855-4100

**NORTH DAKOTA** - Medicaid
Website: http://www.nd.gov/dhs/services/medicalserv/medicaid/
Phone: 1-800-755-2604

**OKLAHOMA** - Medicaid and CHIP
Website: http://www.insureoklahoma.org
Phone: 1-888-365-3742

**OREGON** - Medicaid
Website: http://www.oregonhealthykids.gov
Website: http://www.hijossaludablesoregon.gov
Phone: 1-800-699-9075

**PENNSYLVANIA** - Medicaid
Website: http://www.dpw.state.pa.us/hipp
Phone: 1-800-692-7462

**RHODE ISLAND** - Medicaid
Website: www.ohhs.ri.gov
Phone: 1-401-462-5300

**SOUTH CAROLINA** - Medicaid
Website: http://www.scdhhs.gov
Phone: 1-888-549-0820

**SOUTH DAKOTA** - Medicaid
Website: http://dss.sd.gov
Phone: 1-888-828-0059

**TEXAS** - Medicaid
Website: http://www.gethipptexas.com
Phone: 1-800-440-0493

**UTAH** - Medicaid and CHIP
Website: http://health.utah.gov/upp
Phone: 1-866-435-7414

**VERMONT** - Medicaid
Website: http://www.greenmountaincare.org/
Phone: 1-800-250-8427

*PCM, Inc. Cost Plus HSA/HDHP Plan*
                                              *Eff: 12/1/14*

EXHIBIT B - PAGE 046

**VIRGINIA** - Medicaid and CHIP
Medicaid Website: http://www.dmas.virginia.gov/rcp-HIPP.htm
Medicaid Phone: 1-800-432-5924
CHIP Website: http://www.famis.org/
CHIP Phone: 1-866-873-2647

**WASHINGTON** - Medicaid
Website: http://www.hca.wa.gov/medicaid/premiumpymt/pages/index.aspx
Phone: 1-800-562-3022 ext. 15473

**WEST VIRGINIA** - Medicaid
Website:  www.dhhr.wv.gov/bms/
Phone:  1-877-598-5820, HMS Third Party Liability

**WISCONSIN** - Medicaid
Website: http://www.badgercareplus.org/pubs/p-10095.htm
Phone: 1-800-362-3002

**WYOMING** - Medicaid
Website: http://www.health.wyo.gov/healthcarefin/equalitycare
Phone: 1-307-777-7531

To see if any more States have added a premium assistance program since January 31, 2014, or for more information on special enrollment rights, you can contact either:

**U.S. Department of Labor**
Employee Benefits Security Administration
www.dol.gov/ebsa
1-866-444-EBSA (3272)

Or

**U.S. Department of Health and Human Services**
Centers for Medicare & Medicaid Services
www.cms.hhs.gov
1-877-267-2323, Ext. 61565

## PRIVACY OF PROTECTED HEALTH INFORMATION (PHI)

Effective April 14, 2004, the Plan will not use or disclose PHI except as permitted by this section or as otherwise permitted or required by law, including but not limited to the Privacy Standards of the Health Insurance Portability and Accountability Act of 1996 (the "HIPAA Privacy Standards"), as they may be amended from time to time. Nothing in this section shall be construed to prohibit the Plan Sponsor's receipt of "summary health information," as described in the HIPAA Privacy Standards, for certain Plan Sponsor-related purposes, including obtaining premium bids for health insurance, making Plan design and funding decisions, and modifying, amending or terminating the Plan.

## PLAN SPONSOR'S OBLIGATIONS REGARDING PROTECTED HEALTH INFORMATION (PHI)

Effective April 14, 2004, the Plan will disclose PHI to the Plan Sponsor only upon receipt of a certification by the Plan Sponsor to the Plan that the Plan has been amended to provide for the Plan Sponsor's receipt of PHI and that the Plan Sponsor agrees to comply with the following provisions:

1.  The Plan Sponsor may use or disclose PHI for Plan enrollment purposes, including information as to whether an individual is enrolled in the Plan.

2.  The Plan Sponsor may use or disclose PHI for Plan administration functions, including for payment or health care operations purposes (as those terms are defined by the HIPAA Privacy Standards), and including quality assurance, Claims processing, auditing and monitoring of the Plan.



3. The Plan Sponsor may not use or further disclose PHI other than as permitted or required by the Plan documents or by law.

4. The Plan Sponsor must ensure that any agents, including subcontractors, to whom the Plan Sponsor provides PHI received from the Plan, agree to the same restrictions and conditions that apply to the Plan Sponsor with regard to the PHI.

5. The Plan Sponsor may not use or disclose the PHI for employment-related actions and decisions or in connection with any other benefit or other Employee Benefit Plan of the Plan Sponsor.

6. The Plan Sponsor must report to the Plan any use or disclosure of the PHI of which the Plan Sponsor becomes aware that is inconsistent with the uses or disclosures provided for under the terms of the Plan.

7. The Plan Sponsor must make PHI available for access in accordance with the HIPAA Privacy Standards regarding an individual's right to access his/her PHI.

8. The Plan Sponsor must make PHI available for amendment and, if required by the HIPAA Privacy Standards, incorporate any amendment made to PHI in accordance with the HIPAA Privacy Standards regarding an individual's right to have his PHI amended.

9. The Plan Sponsor must make available information necessary to provide an accounting to an individual in accordance with the HIPAA Privacy Standards regarding an individual's right to receive an accounting of disclosures of his/her PHI.

10. The Plan Sponsor must make internal practices, books, and records relating to the use and disclosure of PHI available to the Secretary of Health and Human Services for purposes of determining compliance by the Plan with the HIPAA Privacy Standards.

11. The Plan Sponsor must, if feasible, return or destroy all PHI received from the Plan that the Plan Sponsor still maintains in any form and retain no copies of such information when no longer needed for the purpose for which disclosure was made, except that, if such return or destruction is not feasible, the Plan Sponsor must limit further uses and disclosures to those purposes that make the return or destruction not feasible.

12. The Plan Sponsor must ensure adequate separation between the Plan and the Plan Sponsor by restricting access to and use of the PHI to only those Employees of the Plan Sponsor with responsibilities related to the administrative functions the Plan Sponsor performs for the Plan, as such Employees may be designated or identified, by name, job title, or classification, from time to time in various Business Associate Agreements between the Plan and the Plan's Business Associates or in other documents governing the administration of the Plan.

13. The Plan Sponsor must ensure adequate separation between the Plan and the Plan Sponsor by maintaining a procedure for resolving any issues of noncompliance with provisions of the Plan document by persons described in paragraph 12 above through training, sanctions and other disciplinary action, as necessary.

14. The Plan Sponsor shall not directly or indirectly receive remuneration in exchange for any PHI without valid authorization that includes a specification of whether the PHI can be further exchanged for remuneration by the entity receiving PHI of the individual making authorization, except as otherwise allowed under the American Recovery and Reinvestment Act.

**SECURITY OF ELECTRONIC PROTECTED HEALTH INFORMATION (ePHI)**
Effective April 20, 2006, the Plan will not use or disclose ePHI except as permitted by this section or as otherwise permitted or required by law, including but not limited to the requirements of 45 C.F.R. Sections 164.314(b)(1) and (2) and its implementing regulations, 45 C.F.R. parts 160, 162, and 164 of the Security Standards of the Health Insurance Portability and Accountability Act of 1996 (the "HIPAA Security Standards"), as they may be amended from time to time. Nothing in this section shall be construed to

prohibit the Plan Sponsor's receipt of "summary health information," as described in the HIPAA Security Standards, for certain Plan Sponsor-related purposes, including obtaining premium bids for health insurance, making Plan design and funding decisions, and modifying, amending or terminating the Plan.

## PLAN SPONSOR'S OBLIGATIONS REGARDING ELECTRONIC PROTECTED HEALTH INFORMATION (ePHI)

Effective April 20, 2006, the Plan will disclose ePHI to the Plan Sponsor only upon receipt of an amendment to the Plan that the Plan has been amended to provide for the Plan Sponsor's receipt of ePHI and that the Plan Sponsor agrees to comply with the following provisions:

1. The Plan Sponsor shall implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of the ePHI that the Plan Sponsor creates, receives, maintains, or transmits on behalf of the Plan.

2. The Plan Sponsor shall ensure the adequate separation that is required by 45 C.F.R. Section 164.504(f)(2)(iii) of the HIPAA Privacy Rule is supported by Reasonable and appropriate security measures.

3. The Plan Sponsor shall ensure any agent, including a subcontractor, to whom it provides ePHI agrees to implement Reasonable and appropriate security measures to protect such information.

4. The Plan Sponsor shall report to the Plan any Security Incidents of which it becomes aware as described below:

   a. The Plan Sponsor shall report to the Plan within a Reasonable time after the Plan Sponsor becomes aware, any Security Incident that results in unauthorized access, use, disclosure, modification, or destruction of the Plan's ePHI.

   b. The Plan Sponsor shall report to the Plan any other Security Incident on an aggregate basis semi-annually, or more frequently upon the Plan's request.

## BREACH AND SECURITY INCIDENTS

Effective September 23, 2009, the Health Information Technology for Economic and Clinical Health Act (HITECH) of the American Recovery and Reinvestment Act of 2009 (ARRA) imposes notification in the event of a Breach of unsecured Protected Health Information (PHI).

The Plan Sponsor will report to the Privacy Official of the Plan any use or disclosure of PHI not permitted by HIPAA, along with any Breach of unsecured Protected Health Information. The Plan Sponsor will treat the Breach as being discovered in accordance with HIPAA's requirements. The Plan Sponsor will make the report to the Privacy Official not more than thirty (30) calendar days after the Plan Sponsor learns of such non-permitted use or disclosure.  If a delay is requested by a law enforcement official in accordance with 45 C.F.R. § 164.412, the Plan Sponsor may delay notifying the Privacy Official for the time period specified by such regulation. The Plan Sponsor's report will at least:

1. Identify the nature of the Breach or other non-permitted use or disclosure, which will include a brief description of what happened, including the date of any Breach and the date of the discovery of any Breach;

2. Identify Protected Health Information that was subject to the non-permitted use or disclosure or Breach (such as whether full name, social security number, date of birth, home address, account number or other information was involved) on an individual-by-individual basis;

3. Identify who made the non-permitted use or disclosure and who received the non-permitted disclosure;

*PCM, Inc. Cost Plus HSA/HDHP Plan*
                                                          *Eff: 12/1/14*

4. Identify what corrective or investigational action the Plan Sponsor took or will take to prevent further non-permitted uses or disclosures, to mitigate harmful effects and to protect against any further Breaches;

5. Identify what steps the individuals who were subject to a Breach should take to protect themselves; and

6. Provide such other information, including a written report, as the Privacy Official may reasonably request.

The Plan Sponsor will report to the Privacy Official within thirty (30) calendar days any attempted or successful: a) unauthorized access, use, disclosure, modification, or destruction of Electronic Protected Health Information; and b) interference with the Plan Sponsor's system operations in the Plan Sponsor's information systems, of which the Plan Sponsor becomes aware. The Plan Sponsor will make this report upon the Privacy Official's request, except if any such Security Incident resulted in a disclosure or Breach of Protected Health Information or Electronic Protected Health Information not permitted by the HITECH Act, the Plan Sponsor will make the report in accordance with the above.

### FAIR LABOR STANDARDS ACT (FLSA §18B)

FLSA §18B, as added by the Affordable Care Act §1512, provides that, beginning October 1, 2013, an applicable Employer must provide each Employee, regardless of plan enrollment status or of part-time or full-time status, at the time of hiring, a written notice:

1. Informing the Employee of the existence of the Marketplace (referred to in the statute as the Exchange) including a description of the services provided by the Marketplace, and the manner in which the Employee may contact the Marketplace to request assistance;
2. If the Employer Plan's share of the total allowed costs of benefits provided under the Plan is less than sixty (60) percent of such costs, that the Employee may be eligible for a premium tax credit under section 36B of the Internal Revenue Code (the Code) if the Employee purchases a qualified health plan through the Marketplace; and
3. If the Employee purchases a qualified health plan through the Marketplace, the Employee may lose the Employer contribution (if any) to any health benefits plan offered by the Employer and that all or a portion of such contribution may be excludable from income for Federal income tax purposes.

For 2014, the Department of Labor will consider a notice to be provided at the time of hiring if the notice is provided within fourteen (14) days of an Employee's start date. With respect to Employees who are current Employees before October 1, 2013, Employers are required to provide the notice not later than October 1, 2013.

The notice must be provided in writing in a manner calculated to be understood by the average employee, free of charge. Alternatively, it may be provided electronically if the requirements of the Department of Labor's electronic disclosure safe harbor at 29 CFR 2520.104b-1(c) are met.

For more information, please visit: http://www.dol.gov/ebsa/newsroom/tr13-02.html.

## SCHEDULE OF BENEFITS

### MAJOR MEDICAL BENEFITS FOR COVERED PERSONS

**NOTE:** All Claims are subject to review and/or audit to ensure that charges are payable in accordance with the terms and limitations of this Plan.

**LEVEL I PROVIDERS – Facilities and Providers billing as a Facility to include, but not limited to:**

- Hospitals (Inpatient and Outpatient treatment)
- Inpatient Facilities (such as Rehabilitation Facilities, Skilled Nursing Facilities and Hospice)
- Inpatient and Outpatient Facilities for treatment of Mental Disorders, Chemical Dependency, Drug and Substance Abuse
- Ambulatory Surgery Centers
- Dialysis Clinics

**LEVEL II PROVIDERS – Physicians and all other Providers of service**

| Maximum Benefits | |
|---|---|
| **Lifetime Maximum Dollar Benefit**<br>(All Covered Essential Health Benefits) | Unlimited |
| **Annual Maximum Dollar Benefit**<br>(All Covered Essential Health Benefits) | Unlimited |

| Deductible and Annual Out-of-Pocket Maximum | Level I Benefit<br><br>Level II PPO Benefit | Level II Non-PPO Benefit |
|---|---|---|
| **Plan Year Deductible**<br>(Includes Covered Medical and Prescription Drug Expenses)<br>• Employee only<br>• Family (Employee + 1 or more Dependents)* | <br><br><br>$1,500<br>$3,000 | <br><br><br>$3,000<br>$6,000 |
| **Benefit Percentage**<br>(unless otherwise noted) | 80% | 60% |
| **Annual Out-of-Pocket Maximum**<br>(Includes Plan Year Deductible, Per Occurrence Deductibles and Prescription Drug Expenses)<br>• Employee Only<br>• Family (Employee + 1 or more Dependents)* | <br><br><br><br>$3,200<br>$6,400 | <br><br><br><br>$6,400<br>$12,800 |

**NOTE:** The Level I/Level II PPO Plan Year Deductible and Level I/Level II PPO Annual Out-of-Pocket Maximums are determined by combining Level I Covered Charges and Level II (PPO) Covered Charges. A separate Level II Non-PPO Plan Year Deductible and separate Level II Non-PPO Annual Out-of-Pocket Maximum apply to Level II Non-PPO Covered Charges. See Comprehensive Medical Benefits section. Upon reaching the Annual Out-of-Pocket Maximum, Covered Medical and Prescription Drug Expenses are payable at 100% for the remainder of the Plan Year. The Lifetime and Plan Year Maximums are determined by combining Level I and Level II (PPO and Non-PPO) Covered Charges. The Coinsurance reflected in this Schedule of Benefits is the Plan's Benefit Percentage. The Covered Person is responsible for the difference between the Plan's Benefit Percentage and 100%.

*Applies collectively to all Covered Persons in the same Family.

*PCM, Inc. Cost Plus HSA/HDHP Plan*
*Eff: 12/1/14*


## SCHEDULE OF BENEFITS (Cont'd.)

**LEVEL I BENEFITS – Payment Levels and Limits:**
This section applies to covered services rendered by Hospitals and other Facilities shown in the preceding Level I Providers list and to charges for services rendered by Providers billing "as a Facility." The benefits shown apply to all such covered, licensed, accredited Providers of service **without regard to participation in a Preferred Provider Organization (PPO) network.**

| Hospital/Facility Inpatient Services | | |
|---|---|---|
| **Benefit Percentage For:** | **Level I Benefit** | **Maximum Benefits, Limits & Provisions** |
| **Inpatient Hospital Services** | 80% of Allowable Claim Limits for Room and Board/ancillary charges $250 Per Occurrence Deductible and Plan Year Deductible applies | $500 Non-compliance penalty per admission (for failure to notify Utilization Review (UR) Company of Hospital admission). |
| **Maternity Inpatient Hospital Services** | 80% of Allowable Claim Limits for Room and Board/ancillary charges $250 Per Occurrence Deductible and Plan Year Deductible applies | Contact UR Company for Coordination of Care. |
| **Routine Newborn Care Inpatient Hospital Services (to date of mother's discharge)** | 80% of Allowable Claim Limits for nursery Room and Board/ancillary charges Per Occurrence Deductible and Plan Year Deductible are waived | Payable under covered mother's Claim. |
| **Skilled Nursing Facility/ Rehabilitation Facility** | 80% of Allowable Claim Limits for Room and Board/ancillary charges $250 Per Occurrence Deductible and Plan Year Deductible applies | Limited to 60 combined days per Plan Year. UR Notification required or penalty applies. |
| **Mental Disorders/ Chemical Dependency, Drug and Substance Abuse Inpatient Hospital Services/ Residential Treatment Center** | 80% of Allowable Claim Limits for Room and Board/ancillary charges Plan Year Deductible applies | UR Notification required or penalty applies. |
| Hospital Emergency Room Services | | |
| **Hospital Emergency Room** | 80% of Allowable Claim Limits Deductible applies | UR Notification required if admitted Inpatient or penalty applies. |
| Hospital/Facility Outpatient Diagnostic and Preventive Screening Services | | |
| **Select Diagnostic Medical Procedures (MRI, CT scan, etc.; see list in Comprehensive Medical Benefits section)** | 80% of Allowable Claim Limits Deductible applies | |
| **All Other Diagnostic Lab and X-ray** | 80% of Allowable Claim Limits Deductible applies | |
| **Routine Bone Density Test, Other Routine Diagnostic Lab and X-ray** | 100% of Allowable Claim Limits Deductible waived | |
| **Annual Mammogram (Routine or Diagnostic)** | 100% of Allowable Claim Limits Deductible waived | |
| **Colonoscopy (Routine or Diagnostic) (including polyp removal)** | 100% of Allowable Claim Limits Deductible waived | |

*PCM, Inc. Cost Plus HSA/HDHP Plan*
*Eff: 12/1/14*

## SCHEDULE OF BENEFITS (Cont'd.)

| Women's Elective Sterilization Procedures | | |
|---|---|---|
| **Benefit Percentage For:** | **Covered Benefit** | **Maximum Benefit Limits & Provisions** |
| **All Covered Expenses** | 100% of Allowable Claim Limits Copay and Deductible waived | All FDA approved |
| Outpatient Surgery/Ambulatory Surgery Centers | | |
| **All Covered Expenses** | 80% of Allowable Claim Limits Deductible applies | Contact UR Company for Coordination of Care. |
| Outpatient Psychiatric Day Treatment Facility and Outpatient Chemical Dependency Drug Treatment Facility | | |
| **Day Treatment Facility** | 80% of Allowable Claim Limits Deductible applies | Contact UR Company for Coordination of Care. |
| **Psychological Testing** | 80% of Allowable Claim Limits Deductible applies | |
| **Outpatient Therapy** (including group therapy and Family counseling) | 80% of Allowable Claim Limits Deductible applies | |
| Physical, Occupational and Speech Therapy Services and Pulmonary Rehabilitation | | |
| **All Covered Expenses** | 80% of Allowable Claim Limits Deductible applies | Limited to 20 visits per each therapy per Plan Year. |
| Cardiac Rehabilitation | | |
| **All Covered Expenses** | 80% of Allowable Claim Limits Deductible applies | Limited to 36 visits per Plan Year. |
| Chemotherapy, Radiation Therapy, Infusion Therapy and Dialysis Facilities | | |
| **All Covered Expenses** | 80% of Allowable Claim Limits Deductible applies | Contact UR Company for Coordination of Care. |
| Diabetic Self-Management Training | | |
| **All Covered Expenses** | 80% of Allowable Claim Limits Deductible applies | |
| Hospice | | |
| **All Covered Expenses** **Inpatient** (includes bereavement counseling) | 80% of Allowable Claim Limits for Room and Board/ancillary charges $250 Per Occurrence Deductible and Plan Year Deductible applies | UR Notification required for Inpatient or penalty applies. For Homebound Hospice contact UR Company for Coordination of Care. Limited to 360 days/visits combined per Lifetime. |
| **Homebound** (includes bereavement counseling) | 80% of Allowable Claim Limits Deductible applies | |
| All Other Covered Hospital/Facility Services and Supplies | | |
| **All Other Covered Expenses** | 80% of Allowable Claim Limits Deductible applies | UR Notification required for Inpatient or penalty applies. |

*PCM, Inc. Cost Plus HSA/HDHP Plan*
*Eff: 12/1/14*

## EXHIBIT B - PAGE 053

## SCHEDULE OF BENEFITS (Cont'd.)

**LEVEL II BENEFITS – Payment Levels and Limits:**
This section applies to covered services rendered by Physicians and all other Providers not listed in Level I. Benefits shown are payable **based upon the Provider's participation in the Preferred Provider Organization (PPO) network.**

The "Level II PPO Benefit" applies to services rendered by Preferred Providers in the designated PPO Network (In-Network); the "Level II Non-PPO Benefit" applies to services rendered by Providers other than Preferred Providers (Out-of-Network). The "Level II PPO Benefit" also applies in the following exceptions:

1. If a Covered Person has no choice of PPO Providers in the specialty that the Covered Person is seeking within the PPO service area;
2. If a Medical Emergency or initial treatment of an Accidental Injury requires immediate care, and services are rendered by Non-PPO Providers; or
3. If a Covered Person receives Medically Necessary services from a Non-PPO Provider because the Covered Person is living or traveling outside of the geographic zip code area serviced by the PPO (Out-of-Area); or
4. If a Covered Person seeks treatment in a Hospital or Ambulatory Surgery Center, and required services are rendered by a Non-PPO radiologist, anesthesiologist, pathologist, assistant surgeon, on-call Physician/specialist or Emergency Room Physician.

Maximum Benefits, Limits and Provisions are subject to all other Plan exclusions, limitations and provisions set forth in this Plan.

| Physician Services | | | |
|---|---|---|---|
| **Benefit Percentage For:** | **Level II PPO Benefit** | **Level II Non-PPO Benefit** | **Maximum Benefits, Limits & Provisions** |
| **Physician Hospital Visits/ Surgeon** | 80% of PPO rate Deductible applies | 60% of Usual and Customary fees Deductible applies | |
| **Physician Hospital Visit for Mental Disorders/Chemical Dependency, Drug and Substance Abuse** | 80% of PPO rate Deductible applies | 60% of Usual and Customary fees Deductible applies | |
| **Emergency Room Physician** | 80% of PPO rate Deductible applies | 80% of Usual and Customary fees PPO Deductible and Out-of-Pocket Maximum applies | |
| **Maternity** (including prenatal care, delivery and postnatal care) Lab and X-ray Benefit applies. | 80% of PPO rate Deductible applies | 60% of Usual and Customary fees Deductible applies | Contact UR Company for Coordination of Care. |
| **Routine Newborn Care** (Inpatient routine pediatric care to date of mother's discharge) | 80% of PPO rate Deductible waived | 60% of Usual and Customary fees Deductible waived | Payable under covered mother's Claim. |
| **One Call Care Management Radiological Benefit** (CT scans, MRIs and PET scans) | 100% of One Call Care Management negotiated rate PPO Deductible applies | | Call 888-458-8746 to schedule. |

## SCHEDULE OF BENEFITS (Cont'd.)

| Benefit Percentage For: | Level I PPO Benefit | Level II Non-PPO Benefit | Maximum Benefits, Limits & Provisions |
|---|---|---|---|
| **\*Lab and X-ray Benefits** (procedures performed in Freestanding x-ray Facility or independent lab) | | | |
| **Select Diagnostic Medical Procedures** (MRI, CT scan, etc.; see list in Comprehensive Medical Benefits section) When not performed by One Call Care Management. | 80% of PPO rate Deductible applies | 60% of Usual and Customary fees Deductible applies | |
| **All Other Lab/X-ray** | 80% of PPO rate Deductible applies | 60% of Usual and Customary fees Deductible applies | |
| **All Covered Physician Office Expenses Including:**<br>• Office Visit<br>• Examination<br>• Treatment<br>• Diagnostic tests<br>• Lab and x-rays<br>• Allergy testing and serum/ injections<br>• Voluntary Second or Third Opinion (exam)<br>• Office Surgery<br>• Medical Supplies<br>• Retail Limited Services Clinic<br>• Urgent Care Facility (Minor Emergency Medical Clinic)<br>• Other Covered Office Services (without Office Visit billed) | 80% of PPO rate Deductible applies | 60% of Usual and Customary fees Deductible applies | |
| **\*Sterilization Procedures** (vasectomies) | 80% of PPO rate Deductible applies | 60% of Usual and Customary fees Deductible applies | |
| **Mental Disorders/ Chemical Dependency, Drug and Substance Abuse Office Visit/Group Therapy/ Family Counseling/ \*Psychological Testing** | 80% of PPO rate Deductible applies | 60% of Usual and Customary fees Deductible applies | |
| **Chiropractic Services** (including x-rays) | 80% of PPO rate Deductible applies | 60% of Usual and Customary fees Deductible applies | Limited to 1 visit and 1 treatment per day and limited to $500 Plan Year Maximum Benefit. |
| **All Other Covered Physician Services** | 80% of PPO rate Deductible applies | 60% of Usual and Customary fees Deductible applies | |

\* If these services are rendered by Providers billing as a Facility, please refer to the appropriate category under Level I for the benefit.

*PCM, Inc. Cost Plus HSA/HDHP Plan*
                                                              *Eff: 12/1/14*

## EXHIBIT B - PAGE 055

## SCHEDULE OF BENEFITS (Cont'd.)

| Other Covered Services | | | |
|---|---|---|---|
| **Benefit Percentage For:** | **Level II PPO Benefit** | **Level II Non-PPO Benefit** | **Maximum Benefits, Limits & Provisions** |
| **\*Therapy Services**<br>• Physical<br>• Occupational<br>• Speech<br>• Pulmonary Rehabilitation | 80% of PPO rate Deductible applies | 60% of Usual and Customary fees Deductible applies | Limited to 20 visits per each therapy per Plan Year. |
| **\*Cardiac Rehabilitation** | 80% of PPO rate Deductible applies | 60% of Usual and Customary fees Deductible applies | Limited to 36 visits per Plan Year. |
| **\*Chemotherapy/ Radiation Therapy/ Infusion Therapy/ Dialysis** | 80% of PPO rate Deductible applies | 60% of Usual and Customary fees Deductible applies | Contact UR Company for Coordination of Care. |
| **\*Durable Medical Equipment/Medical Supplies** | 80% of PPO rate Deductible applies | 60% of Usual and Customary fees Deductible applies | Contact UR Company for Coordination of Care for DME over $1,000. |
| **\*Orthotic Devices/ Orthotic Insoles** | 80% of PPO rate Deductible applies | 60% of Usual and Customary fees Deductible applies | Orthotic insoles covered for diabetics only. |
| **\*Prosthetics** | 80% of PPO rate Deductible applies | 60% of Usual and Customary fees Deductible applies | Contact UR Company for Coordination of Care for Prosthetics over $2,500. |
| **Hearing Aids/Devices and Hearing Exam** | 80% of PPO rate Deductible applies | 60% of Usual and Customary fees Deductible applies | Maximum Benefit $2,500 per 3 Plan Years for Hearing Care. |
| **\*Home Health Care Services** | 80% of PPO rate Deductible applies | 60% of Usual and Customary fees Deductible applies | Limited to 60 visits per Plan Year. Contact UR Company for Coordination of Care. |
| **\*Home Infusion Therapy** | 80% of PPO rate Deductible applies | 60% of Usual and Customary fees Deductible applies | Contact UR Company for Coordination of Care. |

\* **If these services are rendered by Providers billing as a Facility, please refer to the appropriate category under Level I for the benefit.**

*PCM, Inc. Cost Plus HSA/HDHP Plan*
*Eff: 12/1/14*

EXHIBIT B - PAGE 056

## SCHEDULE OF BENEFITS (Cont'd.)

| Other Covered Services (Cont'd.) | | | |
|---|---|---|---|
| Benefit Percentage For: | Level I PPO Benefit | Level II Non-PPO Benefit | Maximum Benefits, Limits & Provisions |
| **\*Hospice Homebound** | 80% of PPO rate Deductible applies | 60%  of Usual and Customary fees Deductible applies | Limited to 360 days per Lifetime. For Homebound Hospice contact UR Company for Coordination of Care. |
| Bereavement Counseling | 80% of PPO rate Deductible applies | 60% of Usual and Customary fees Deductible applies | Bereavement counseling not subject to Hospice Lifetime Maximum. |
| **Diabetic Self-Management Training Office Visit** | 80% of PPO rate Deductible applies | 60% of Usual and Customary fees Deductible applies | |
| **Temporomandibular Joint (TMJ) Disorders** \*All Covered Services | 80% of PPO rate Deductible applies | 60% of Usual and Customary fees Deductible applies | Limited to $1,000 Plan Year Maximum Benefit. |
| **\*Ambulance — Air or Ground Transportation** | 80% of PPO rate Deductible applies | 80% of Usual and Customary fees; PPO Deductible and Out-of-Pocket apply | |
| **\*All Other Covered Expenses** | 80% of PPO rate Deductible applies | 60% of Usual and Customary fees Deductible applies | |

**\*  If these services are rendered by Providers billing as a Facility, please refer to the appropriate
category under Level I for the benefit.**

*PCM, Inc. Cost Plus HSA/HDHP Plan*
*Eff: 12/1/14*

## SCHEDULE OF BENEFITS (Cont'd.)

| Preventive and Wellness Care Benefits | | | |
|---|---|---|---|
| This benefit is payable for Covered Procedures incurred as part of a Preventive and Wellness Care Program and is not payable for treatment of a diagnosed illness or injury. Services must be identified and billed as routine or part of a routine physical exam/or as specified below. | | | |
| **Benefit Percentage For:** | **Level II PPO Benefit** | **Level II Non-PPO Benefit** | **Limits & Provisions** |
| All Covered Wellness Benefits | 100% of PPO rate Copay and Deductible waived | 60% of Usual and Customary fees Deductible applies | See age and frequency limits and other special provisions below |
| **Examples of Covered Wellness Procedures to include but are not limited to:**<br><br>1.  Routine Physical Exam<br>2.  Annual Well Woman Exam<br>3.  *Annual Pap smear and other routine lab<br>4.  *Annual Mammogram (routine)<br>5.  *Bone Density test (routine)<br>6.  *Annual PSA test (routine)<br>7.  Well Baby Care Exam/Well Child Care Exam<br>8.  Routine Immunizations<br>9.  Flu vaccine/pneumonia vaccine<br>10. *Routine lab, x-ray, diagnostic testing and other medical screenings<br>11. Routine Vision Screening for Children (under age 19)<br>12. Routine Hearing Screening (newborns)<br>13. *Routine/Diagnostic Colonoscopy (including polyp removal)<br>14. Tobacco Use Screening/Cessation Intervention (limited to 2 Office Visits per Plan Year)<br>15. *All FDA approved Women's Contraceptive methods and Women's elective Sterilization procedures | | | |
| **NOTE:** Refer to the definition of "Preventive Care" for a link to a website that lists additional services that may be covered for preventive treatment. | | | |

**\* If these services are rendered by Providers billing as a Facility, please refer to the appropriate category under Level I for the benefit.**

*PCM, Inc. Cost Plus HSA/HDHP Plan*
*Eff: 12/1/14*

## EXHIBIT B - PAGE 058

## ORGAN TRANSPLANT BENEFITS

Benefits are available for a human organ, tissue and bone marrow transplant subject to the following conditions:

1. Benefits will be provided subject to determination made on an individual case by case basis in order to establish Medical Necessity;
2. Benefits will be provided only when the Hospital and Physician customarily bill for the medical care and services involved in the human organ, tissue or bone marrow transplant;
3. Under no circumstances will benefits be available for any "personal service" fee, organ, tissue or bone marrow fee or any other similar charge or fee;
4. Only those necessary Hospital and Physician's medical care and service expenses, with respect to the donation, will be considered for benefits; and
5. Benefits will be provided for the appropriate Hospital standard organ, tissue or bone marrow acquisition costs (live Donor or cadaver), storage and transportation of human organ, tissue or bone marrow donation.

When a Hospital's or a Physician's medical care and services are required for any type of human organ, tissue or bone marrow transplant from a living Donor (to a transplant recipient) which requires surgical removal of the donated organ, tissue or bone marrow, coverage under the Plan is available only under the following circumstances:

1. When only the transplant recipient is a Covered Person, the benefits of the Plan will be provided to the Donor to the extent that benefits are not provided to the Donor under any other available coverage; or
2. When the transplant recipient and the Donor are both Covered Persons, benefits will be provided for both in accordance with the recipient's Covered Expenses.

Transplant Benefits will be payable as follows:

| Benefit Percentage For: | Transplant Program | Non-Transplant Program | Limits & Provisions |
|---|---|---|---|
| **Organ, Tissue and Bone Marrow Transplants** (Non-experimental transplants only) | 80% of Program rate $250 Per Occurrence Deductible and PPO Plan Year Deductible applies | 60% of Usual and Customary fees $250 Per Occurrence Deductible and Non-PPO Plan Year Deductible applies | UR Notification required for a transplant procedure or penalty applies. Contact the UR Company upon transplant evaluation for Coordination of Care and access to the Transplant Program. |
| **Donor Expenses** Donor expenses covered if recipient is covered by this Plan. Payable under recipient's Claim. | 80% of Program rate PPO Plan Year Deductible applies | 60% of Usual and Customary fees Non-PPO Plan Year Deductible applies | |
| **Organ Transplant Travel/Lodging Benefit** | 100% PPO Plan Year Deductible waived *Per Diem rate applies: $50 for 1 person $100 for 2 people* | Not covered | Transplant Program Travel/Lodging Limited to $10,000 Maximum Benefit Per Transplant |

## NOTIFICATION TO UTILIZATION REVIEW COMPANY REQUIRED*

Expenses incurred in connection with any Organ or Tissue Transplant will be covered subject to notification and referral to the Plan Administrator's authorized review specialist. (Cornea transplants and heart valve replacements are not subject to this notification provision, but will be considered on the same basis as any other medical expense coverage under this Plan.) Transplant coverage is offered under this Plan through a Preferred Provider Transplant Program of specialized professionals and Facilities. Coverage is also provided for transplant services obtained outside of the Preferred Provider Transplant Program at a reduced benefit level.

*PCM, Inc. Cost Plus HSA/HDHP Plan
Eff: 12/1/14*

As soon as reasonably possible, but in no event more than ten (10) days* after a Covered Person's attending Physician has indicated that the Covered Person is a potential candidate for a transplant, the Covered Person or his Physician should notify the Plan Administrator's Utilization Review Company for referral to the program's Medical Review Specialist for evaluation and Coordination of Care. A comprehensive treatment plan must be developed for this Plan's medical review, and must include such information as diagnosis, the nature of the transplant, the setting of the procedure (i.e., name and address of the Hospital), any secondary medical complications, a five (5) year prognosis, two (2) qualified opinions confirming the need for the procedure, as well as a description and the estimated cost of the proposed treatment (one (1) or both confirming second opinions may be waived by the Plan's Medical Review Specialist). Additional attending Physicians' statements may also be required. The Covered Person may provide a comprehensive treatment plan independent of the Preferred Provider Transplant Program, but this will be subject to a medical appropriateness review and may result in Non-Transplant Program benefit coverage.

All potential transplant cases will be assessed for their appropriateness by Case Management.

* **Failure to notify the Utilization Review Company of a transplant procedure will result in the application of a $500 penalty to all Covered Expenses incurred by the transplant recipient as a result of the transplant. If a non-compliance penalty is imposed for failure to notify the Utilization Review Company, that amount will never be included as part of the Plan Year Deductible, Copay or Annual Out-of-Pocket Maximum.**

## ORGAN TRANSPLANT PROGRAM

As a result of the medical review, the Covered Person will be asked to consider obtaining transplant services at a participating Center of Excellence Facility with the Transplant Program arranged by the Plan Administrator's authorized review specialist. The purpose of designating Centers of Excellence Facilities is to perform necessary transplants in the most appropriate setting for the procedure, to improve the quality and probability of a successful outcome and reduce the average cost of the procedures.

**There is no obligation for the patient to use a Participating Transplant Program Facility. However, benefits for the transplant and its related expenses may vary depending on whether services are provided in or out of the Transplant Program. If a transplant is performed in a Non-Transplant Program Facility but the Covered Person has received approval from the Plan's Medical Review Specialist for Non-Transplant Program services, then Transplant Program Benefits will apply to the transplant and its related expenses. If services are provided in a Non-Transplant Program Facility without approval from the Medical Review Specialist, then Non-Transplant Program Benefits will apply.**

## TRANSPLANT BENEFIT PERIOD

Covered Transplant Expenses will accumulate during a Transplant Benefit Period and will be charged toward the Transplant Benefit Period Maximums, if any, shown in the Transplant Schedule of Benefits. The term "Transplant Benefit Period" means the period beginning on the date of the initial evaluation and ending on the date twelve (12) consecutive months following the date of the transplant. (If the transplant is a bone marrow transplant, the date the marrow is re-infused is considered the date of the transplant.)

## COVERED TRANSPLANT EXPENSES

The term "Covered Expenses" with respect to transplants includes the Usual and Customary expenses for services and supplies which are covered under this Plan (or which are specifically identified as covered only under this provision) and which are Reasonable and Medically Necessary and appropriate for the transplant, including:

1. Charges incurred in the evaluation, screening and candidacy determination process.

2. Charges incurred for organ transplantation.

*PCM, Inc. Cost Plus HSA/HDHP Plan*
                                                                    *Eff: 12/1/14*

3. Charges for organ procurement, including Donor expenses not covered under the Donor's plan of benefits.

   Coverage for organ procurement from a non-living Donor will be provided for costs involved in removing, preserving and transporting the organ.

   Coverage for organ procurement from a living Donor will be provided for the costs involved in screening the potential Donor, transporting the Donor to and from the site of the transplant, as well as for medical expenses associated with removal of the donated organ and the medical services provided to the Donor in the interim and for follow up care.

   If the transplant procedure is a bone marrow transplant, coverage will be provided for the cost involved in the removal of the patient's bone marrow (autologous) or the Donor's marrow (allogeneic). Coverage will also be provided for search charges to identify an unrelated match and treatment and storage cost of the marrow, up to the time of re-infusion. (The harvesting of the marrow need not be performed within the Transplant Benefit Period.)

4. Charges incurred for follow up care, including immunosuppressant therapy.

5. Charges for transportation on the same day to and from the site of the covered organ transplant procedure for the recipient and one (1) other individual, or in the event that the recipient or the Donor is a minor, two (2) other individuals for purposes of transplant evaluation, the transplant procedure or necessary post-discharge follow-up.

   Eligible charges for lodging for the patient (while not confined) and one (1) other individual will be paid at a per diem rate of $50. In the event the recipient or the Donor is a minor, charges for lodging for the patient (while not confined) and two (2) other individuals will be paid at a per diem rate of $100.

   In addition, all Reasonable and necessary lodging and meal expenses incurred during the Transplant Benefit Period will be covered up to a Maximum of $10,000 per transplant period.

   **NOTE:** The Travel and Lodging Benefit is payable only if the Transplant Program is used and if the transplant recipient resides more than 50 miles from the transplant program designated Facility.

## RE-TRANSPLANTATION

Re-transplantation will be covered up to two (2) re-transplants, for a total of three (3) transplants per person, per lifetime. Each transplant will be subject to the Notification and review requirement for organ transplant. Each transplant and re-transplant will have a new Benefit Period.

## ACCUMULATION OF EXPENSES

Expenses incurred during any transplant period for the recipient and for the Donor will accumulate towards the recipient's benefit.

## DONOR EXPENSES

Medical expenses of the Donor will be covered under this provision to the extent that they are not covered elsewhere under this Plan or any other benefit plan covering the Donor.

*PCM, Inc. Cost Plus HSA/HDHP Plan*
                                         *Eff: 12/1/14*

# PRESCRIPTION DRUG PLAN BENEFITS

**Prescription Drug expenses apply to satisfy the Medical Plan's Level I/Level II (PPO) Plan Year Deductible. The Plan requires the member to pay the entire cost of Prescription Drug expenses until the Deductible has been met. After the Deductible is met, Prescription Drug Copays apply to satisfy the Annual Out-of-Pocket Maximum. After the Annual Out-of Pocket Maximum is met, covered Prescription Drugs are payable at 100% with Copays waived for the remainder of the Plan Year.**

| | |
|---|---|
| **Prescription Card Service** | **100% after applicable Copay** |
| Supply Limit | 31 days |
| Generic Drugs (Tier 1) | $10 Copay |
| Formulary Brand Name Drugs (Tier 2) | $35 Copay |
| Non-Formulary Brand Name Drugs (Tier 3) | $65 Copay |
| | |
| Supply Limit | 90 days |
| Generic Drugs (Tier 1) | $30 Copay |
| Formulary Brand Name Drugs (Tier 2) | $105 Copay |
| Non-Formulary Brand Name Drugs (Tier 3) | $195 Copay |
| | |
| **Mail Order Service** | **100% after applicable Copay** |
| Supply Limit | 90 days |
| Generic Drugs (Tier 1) | $25 Copay |
| Formulary Brand Name Drugs (Tier 2) | $87.50 Copay |
| Non-Formulary Brand Name Drugs (Tier 3) | $162.50 Copay |
| | |
| **Specialty Drugs*** | **100% after applicable Copay** |
| Supply Limit | 30 days |
| Generic Drugs (Tier 1) | $10 Copay |
| Formulary Brand Name Drugs (Tier 2) | $35 Copay |
| Non-Formulary Brand Name Drugs (Tier 3) | $65 Copay |

*All Specialty Drugs can be obtained through the Prescription Drug Plan's Specialty Pharmacy, Mail Order Service or a retail pharmacy. One (1) retail fill will be allowed before filling will be required at the Specialty Pharmacy.

If the pharmacy charge is less than the Generic or Brand Copay, then the actual charge will become the Copay. Generic and Brand Name copayments apply separately to each prescription and refill and do not apply to the Plan Year Deductible. To be covered, Prescription Drugs must be:

1. Purchased from a participating licensed pharmacist;
2. Dispensed to the Covered Person for whom they are prescribed; and
3. Legally prescribed by a Qualified Prescriber.

## DEFINITIONS

### Brand Name Drugs (Tier 2 and Tier 3)
Trademark Drugs or substances marketed by the original manufacturer.  Tier 2 Drugs are commonly used Brand Name Drugs shown on the Formulary Drug List as "Formulary Alternative(s)."  Tier 3 Drugs are Brand Name Drugs listed as "Non-Formulary" or not listed.  Brand Name Drugs with Generic alternatives are considered "Non-Formulary."

### Generic Drugs (Tier 1)
Drugs or substances which:

1. Are not trademark Drugs or substances; and
2. May be legally substituted for trademark Drugs or substances.

*PCM, Inc. Cost Plus HSA/HDHP Plan*
*Eff: 12/1/14*



**Over the Counter (OTC) Drugs**
Drugs which do not require a prescription from a Qualified Prescriber, unless otherwise specified.

**Prescription Drugs**
Legend Drugs or medicines which are prescribed by a Qualified Prescriber for the treatment of Illness, Injury or Pregnancy.

**Qualified Prescriber**
A licensed Physician, Dentist, or other health care Practitioner who may, in the legal scope of his/her practice, prescribe Drugs or medicines.

**Specialty Drugs**
Specialty pharmaceuticals include biotech Drugs produced using living organisms which are high cost or injectable Drugs that require heightened patient management and support.

**Step Therapy**
Step Therapy is the practice of starting Drug therapy for a medical condition with the most cost-effective and safest Drug available, then progressing to other more costly alternatives if necessary.

### Product Selection
The pharmacist substitutes more economically priced Generic equivalent Drugs whenever possible unless there is a specific request for a Brand Name by the prescribing Physician or when State law requires no substitution for the Brand Name Drug. **Under this program if the prescribing Physician does not specify the Brand Name, but the Covered Person requests the Brand product when there is a Generic substitute available, the Covered Person is required to pay the difference in cost between the Brand and Generic product in addition to the usual Brand Copay (applies to Prescription Card only and Mail Order).**

Most pharmacists, as a courtesy to the patient, will ask whether a Generic Drug is acceptable to the Covered Person if the Physician has specified "product selection permitted" on the prescription. If the Physician has specified "dispense as written," no choice is given to the patient, and only the applicable Copay will be charged.

### Drug Review
The Plan includes a Drug Review program which is automatically administered by the pharmacist through a nationwide computer network that verifies the eligibility of each Covered Person's card and protects the Covered Person from conflicting prescriptions which might prove harmful if taken at the same time. This program also guards against duplication of medications and incorrect dosage levels.

**The following Covered and Excluded Drug listings are not all inclusive.** To find out if a particular Drug is covered, please contact the Prescription Card Service Customer Service phone number listed on the Plan Participant identification card.

### Prescription Drug Plan – Covered Drugs
1. Legend Drugs (Drugs requiring a prescription either by Federal or State law) (there are certain Legend Drugs that may be excluded);
2. Insulin on prescription;
3. Disposable insulin needles/syringes, test strips and lancets on prescription;
4. Compounded medications of which at least one ingredient is a prescription legend Drug;
5. All FDA approved women's contraceptive Drugs and methods ($0 Copay Generic only; if no Generic available, $0 Copay applies to Brand);
6. Tobacco deterrent medications or any other tobacco use OTC cessation aids, all dosage forms ($0 Copay Generic only; if no Generic available, $0 Copay applies to Brand; 90-day supply limit per Plan Year); and
7. Specialty Drugs.

**NOTE: Some Drugs may require authorization and may only be covered, and/or covered for certain ages, if Medically Necessary.**

**NOTE: Refer to the definition of "Preventive Care" for a link to a website that lists additional Drugs that may be covered for preventive treatment.**

*PCM, Inc. Cost Plus HSA/HDHP Plan*
*Eff: 12/1/14*

**Prescription Drug Plan – Excluded Drugs**
1. Abortifacients;
2. Drugs for Cosmetic purposes;
3. Drugs prescribed for impotence/sexual dysfunction;
4. Fertility Drugs;
5. Weight loss medications;
6. Immunization agents, biological sera, blood or blood plasma;
7. Therapeutic devices or appliances, including needles, syringes, support garments and other non-medical substances, regardless of intended use, except those listed above;
8. Charges for the administration or injection of any Drug;
9. Prescriptions which a Covered Person is entitled to receive without charge from any Workers' Compensation laws;
10. Drugs labeled "Caution-limited by Federal law to Investigational use," or Experimental Drugs, even though a charge is made to the individual;
11. Medication which is to be taken by or administered to an individual, in whole or in part, while he/she is a patient in a licensed Hospital, Extended Care Facility, nursing home or similar institution which operates on its premises, or allows to be operated on its premises, a Facility for dispensing pharmaceuticals; and
12. Any prescription refilled in excess of the number specified by the Physician, or any refill dispensed after one (1) year from the Physician's original order.

**NOTE: Drugs excluded from the Prescription Drug Plan are not payable under Major Medical Expense Benefits.**

**A Prescription Drug dispensed by a retail pharmacy, Mail Order Service or Specialty Pharmacy for which a Copay applies is not considered a Claim for benefits under this Plan and, therefore, is not subject to the Plan's Claim Filing Procedures.**

**When Alternative Care and treatment are identified by Case Management as Medically Necessary and approved by the Plan Administrator, and where there is a Reasonable expectation of savings to the Plan without sacrificing the quality of care to the patient, the Plan may approve and pay for all or part of the charges not shown as a Covered Prescription Drug in this Plan Document.**

## PRESCRIPTION DRUG UTILIZATION REVIEW

The Prescription Drug benefit does not have unlimited coverage. As with all medical and Hospital services, Prescription Drug utilization is subject to determinations of Medical Necessity and appropriate use. Drug Utilization Review may be concurrent, retrospective or prospective.

Concurrent Drug Utilization Review generally occurs at the time of service and may include electronic Claim audits which may help to protect patients from potential Drug interactions or Drug-therapy conflicts or overuse/under use of medications.

Retrospective Drug Utilization Review generally involves Claim review and may include communication by the Prescription Drug Plan and/or the Utilization Review Company with the prescribing Physician to coordinate care and verify diagnoses and Medical Necessity. It may include a peer review by a Physician of like specialty to the prescribing Physician reviewing the medical and pharmacy records to determine Medical Necessity.

Should Medical Necessity not be determined by the peer review Physician, the treating Physician and Plan Participant will be notified and provided with the peer review results. The Plan Participant and Physician will be forwarded information on the appeal process as outlined in this Plan.

Prospective Drug Utilization Review may include, among other things, Physician or pharmacy assignment in which one Physician and/or one pharmacy is selected to serve as the coordinator of prescription Drug services and benefits for the eligible Plan Participant. The Plan Participant will be notified in writing of this and will be required to designate a Physician and pharmacy as his/her providers.

## UTILIZATION REVIEW (UR) PROGRAM

The Utilization Review program is designed to help all Plan Participants receive Medically Necessary health care. The Utilization Review Company is HealthWatch, Group & Pension Administrators, Inc. Medical Cost Containment Services. **Notification must be provided to the Utilization Review Company for all services as detailed below. It is not necessary to contact the Plan or the Utilization Review Company for prior approval of such services.**

### UR NOTIFICATION REQUIREMENTS

**Notification is required within forty-eight (48) hours following the services listed below (or the next business day if holiday or weekend admission):**

- **Inpatient Hospital/Facility admissions (including admissions for Mental Disorders, Chemical Dependency, Drug and Substance Abuse);**
- **Outpatient Surgical Procedures other than those performed in the Physician's office (including non-cosmetic procedures for: reduction mammoplasty, breast reconstruction except after cancer surgery, vein stripping, ligation and sclerotherapy, upper lid blepharoplasty, dental services necessitated by Accidental Injury) (penalty waived for routine colonoscopy);**
- **Durable Medical Equipment purchase or rental in excess of $1,000;**
- **Prosthetic Devices in excess of $2,500;**
- **Home Health Care; and**
- **Transplants.**

**See Organ Transplant Benefits section for UR Notification requirements for transplants.**

The Utilization Review Company Nurse may discuss with the Physician and/or Hospital/Facility the diagnosis, the need for hospitalization versus alternative treatment, and length of any Hospital/Facility confinement. The Utilization Review Company will notify the Physician and/or Hospital/Facility verbally or electronically of the outcome of the Utilization Review.

**Failure to notify the Utilization Review Company or comply with these requirements will result in a $500 penalty applied to the services listed above. If this non-compliance penalty is imposed for failure to notify the Utilization Review Company, that amount will not be included as part of the Plan Year Deductible, Copay or Annual Out-of-Pocket Maximum.**

**NOTE:** **Please refer to the Plan Participant identification card for name and phone number of the Utilization Review Company. While UR Notification of certain services is required under the Plan, that notice does not constitute a Claim and any such action taken by the Utilization Review Company does not constitute a Benefit Determination. Utilization Review is also being provided as a courtesy for Plan Participants in an attempt to ensure such services will be Covered Medical Expenses under the Plan. All Claims are subject to all Plan requirements, such as Medical Necessity, Major Medical Expense Benefits, Plan Exclusions, Maximum Benefits and Limitations and Eligibility provisions at the time care and services are provided.**

### CONCURRENT REVIEW

Following notification of a Hospital/Facility admission, a Concurrent Review of treatment will be conducted by the Utilization Review Company. "Concurrent Review" means the Utilization Review Company will monitor the Covered Person's Hospital stay and periodically evaluate the need for continued hospitalization. In addition, the Utilization Review Company may assist with discharge planning and address the health care needs of the patient upon release. This may involve consultation with the Covered Person's Physician and comparison of clinical information to nationally accepted criteria.

### COORDINATION OF CARE

Coordination of Care may be indicated for medical treatment that is Medically Necessary, not Experimental and does not require UR Notification. Coordination of Care is provided by a Registered Nurse (R.N.) to assist the Plan Participant with coordination of medical care, prevent duplicate diagnostic testing and/or treatment and identify and refer patients with diagnoses that would benefit from further Plan programs such as Case Management, Disease Management and/or Maternity Support.

*PCM, Inc. Cost Plus HSA/HDHP Plan
Eff: 12/1/14*

## CASE MANAGEMENT

During the Utilization Review process, catastrophic cases such as transplants, burns, spinal cord Injuries, cancer and other large cases will be identified and Case Management may be initiated. Case Management is provided by Nurses with specialized training and/or advanced national certification. The Nurse may monitor the medical care, consult with the Physicians, coordinate with the health care Providers and Facilities, and communicate with the patient and Family to promote receipt of appropriate, cost effective care to expedite the recovery process. Referrals to Centers of Excellence and Out-of-Network fee negotiations may be included in the Case Management process.

When Out-of-Network fees are negotiated by Case Management and/or the Utilization Review Company on behalf of the Plan, Out-of-Network Covered Charges may be considered at the PPO Benefit level.

### ALTERNATIVE CARE

Through alternative care, Case Management may help the patient and the Plan Administrator obtain care/treatment for a serious Illness or Injury that is Medically Necessary and appropriate for the diagnosis. When alternative care and treatment are identified by Case Management as Medically Necessary and approved by the Plan Administrator, and where there is a Reasonable expectation of savings to the Plan without sacrificing the quality of care to the patient, the Plan may approve and pay for all or part of the charges not shown as a Covered Expense or as a Covered Prescription Drug in this Plan Document. These expenses will be considered on the same basis as the care and treatment for which they are substituted. Benefits provided under this section are subject to all other limitations and provisions within the Plan. In exercising its authority, this Plan will act in a way so as not to discriminate against any Plan Participant. If the care is not being substituted for other Covered Expenses, it will be considered on the same basis as a same or similar Covered Expense or Covered Prescription Drug shown in this Plan Document, as determined by the Claims Administrator.

All benefits provided in this section are subject to Medical Necessity, Reasonableness, and Usual and Customary charges or the Allowable Claim Limits under the Claim Review and Audit Program.

## DISEASE MANAGEMENT

Disease Management is an Employer sponsored voluntary program that is designed to help individuals with certain chronic health conditions to better manage their care. The Utilization Review Company, HealthWatch, supports the relationship between the Physician and the patient by providing information regarding optimal treatment options. The objective is to help individuals stay healthy by providing customized health education information for the most appropriate medical care for each Individual's Illness.

## MATERNITY SUPPORT PROGRAM

A special Maternity Support Program is available from the Utilization Review Company. The program is completely voluntary and provides educational tools to optimize the health of mothers and their newborns. To participate, Covered Persons should call the Utilization Review Company as soon as they know they are pregnant, preferably during the first trimester. Benefits available are:

➢ Coordination of a proactive education program for maternity care;
➢ Assessment of the risk of a Pregnancy;
➢ Identification of personal health factors that could influence the Pregnancy; and
➢ Development of proactive, risk appropriate care delivery programs for covered Pregnancies and births.

*PCM, Inc. Cost Plus HSA/HDHP Plan*
*Eff: 12/1/14*

## GPA NURSE NAVIGATOR[SM]

GPA Nurse Navigator[SM] is a program that will assist Plan Participants with coordination of their medical care. The Plan Participant can call or email Nurse Navigators at the contact information below to receive assistance in finding doctors, hospitals and medical Providers. GPA Nurse Navigator will assist the Plan Participant in researching network Provider options, scheduling appointments, retrieving medical records, completing notifications, consulting a Physician Advisor (if necessary), providing education by a Registered Nurse (R.N.) and assessing for referrals into GPA Care Management Programs. Call GPA Nurse Navigator at 972-238-7900 or 800-843-6705, press option 1 or email GPA Nurse Navigator at nursenavigator@gpatpa.com.

## PORTABILITY AND CREDITABLE COVERAGE

A Certificate of Coverage (Certificate of Group Health Plan Coverage) from the prior plan(s) must be provided to the Plan Administrator at the time of enrollment in this Plan to verify Creditable Coverage.

### CREDITABLE COVERAGE
Creditable Coverage includes most health coverage (subject to HIPAA Rules for Creditable Coverage), such as coverage under a group health plan (including COBRA Continuation Coverage), HMO membership, an individual health insurance policy, Medicaid or Medicare, State Children's Health Insurance Program and any plan established and maintained by a State, the U.S. government or a foreign country. Creditable Coverage does not include coverage consisting solely of dental or vision benefits.

### SIGNIFICANT BREAK IN COVERAGE
A Significant Break in Coverage is a period of sixty-three (63) consecutive days or more during which the Employee or Dependent did not have any Creditable Coverage. Waiting Periods are not considered in determining Significant Breaks in Coverage.

### WAITING PERIOD
A Waiting Period is the time between the first day of employment and the first day of coverage under the Plan. Any period of time before a Special Enrollment or Late Enrollment is not considered a Waiting Period.

See "Employee and Dependent Special Enrollment Periods" and "Late Enrollee" sections of this Plan for requirements on Special Enrollment and Late Enrollment.

### CERTIFICATE OF COVERAGE
To verify Creditable Coverage, a Certificate of Coverage will be issued without charge to an individual who terminates coverage with a group health plan or individual plan. A Certificate of Coverage provides evidence of the date coverage began and the date coverage ended.

The Plan will assist an Employee in obtaining a Certificate of Coverage from a prior plan if requested.

### AUTOMATIC CERTIFICATE OF COVERAGE
A Certificate of Coverage should be provided automatically by group health plans and health insurance issuers under these circumstances:

1. If termination of coverage is a result of a COBRA Qualifying Event and the individual is a qualified beneficiary, a Certificate of Coverage must be provided within the same period of time as the notice of COBRA rights;

2. If an individual has elected COBRA Continuation Coverage or the Plan has provided continued coverage after the COBRA Qualifying Event, the Plan must provide another Certificate of Coverage automatically within a Reasonable period of time after COBRA Continuation Coverage ceases; and

3. If the termination of coverage is not a COBRA Qualifying Event, the Certificate of Coverage must be provided within a Reasonable time period.

### CERTIFICATE OF COVERAGE UPON REQUEST
The Plan will furnish a Certificate of Coverage within a reasonable period of time if the request is made by or on behalf of an individual within twenty-four (24) months after health coverage ceases. A Certificate of Coverage will also be issued upon request even if health coverage remains in force. To request a Certificate of Coverage, contact the Benefits Specialist of the Plan Administrator at 614-854-1399.

*PCM, Inc. Cost Plus HSA/HDHP Plan*
                                              *Eff: 12/1/14*

## EXHIBIT B - PAGE 068

## COMPREHENSIVE MEDICAL BENEFITS

### COVERED MEDICAL EXPENSES (COVERED EXPENSES)

Covered Medical Expenses mean the Reasonable and Usual and Customary charges, Allowable Claim Limit charges and/or contracted PPO charges incurred by or on behalf of a Covered Person for Hospital or other medical services listed below which are:

1. Ordered by a Physician or licensed Practitioner;
2. Medically Necessary for the treatment of an Illness or Injury;
3. Not of a luxury or personal nature; and
4. Not excluded under the Major Medical Exclusions and Limitations section of this Plan.

### COVERED CHARGES

If a Covered Person incurs Covered Medical Expenses as the result of an Illness or Injury, all treatment is subject to benefit payment provisions shown in the Schedule of Benefits and as determined elsewhere in this document.

### HOSPITALS, AMBULATORY SURGERY CENTERS AND OTHER FACILITIES

Facilities do not participate in the PPO Network.  Charges for services rendered in these Facilities will be evaluated under the Claim Review and Audit Program, and Covered Charges will be determined based upon the Allowable Claim Limits. Please refer to the Claim Review and Audit Program section for additional information about the program and Allowable Claim Limits.

### PHYSICIANS AND ALL OTHER COVERED PROVIDERS

**Network Services (PPO):** Network Services (PPO) are health care services provided by a Physician or other Provider in the designated PPO with which the Plan has contracted to provide services at specified fees. Network Covered Charges will be payable at the PPO benefit level.

This Plan may use Allowable Claim Limits to determine Covered Charges in lieu of a PPO discount.

**Out-Of-Network Services (Non-PPO):** Out-of-Network Services (Non-PPO) are health care services provided by a Physician or other Provider that is not in the Plan's designated PPO Network. Out-of-Network Covered Charges will be payable at the Non-PPO benefit level unless the Plan has a direct contract for discounting fees with an Out-of-Network Provider or Out-of-Network services are listed as a PPO benefit exception in the Schedule of Benefits, in which case, the PPO benefit level will apply.

### DEDUCTIBLE AMOUNT (LEVEL I and LEVEL II)

The Deductible amount for each Covered Person is the amount of Covered Medical and Prescription Drug Expenses which must be incurred each Plan Year before benefits are payable for Covered Medical and Prescription Drug Expenses incurred during the remainder of that Plan Year. It is the amount shown in the Schedule of Benefits as the Plan Year Deductible. There is no Deductible carryover from one Plan Year to the next for Covered Charges incurred and applied to the Deductible in the last three (3) months of a Plan Year.

Level I Covered Charges, Level II PPO Covered Charges and Covered Prescription Drug Expenses are combined to satisfy the Level I/Level II PPO Plan Year Deductible. Level II Non-PPO Covered Charges apply to satisfy the Level II Non-PPO Plan Year Deductible. For Employee Plus One (1) or more Dependents the Family Deductible must be satisfied before any benefits are payable if Dependents are covered.

### DEDUCTIBLE FAMILY LIMIT (LEVEL I and LEVEL II)

The Maximum Deductible amounts to be applied each Plan Year to a Covered Employee and his/her covered Dependents will not be more than the Deductible Family Limit shown in the Schedule of Benefits. As soon as the Family Deductible is met by one (1) or more Family members in the same Plan Year, no further Deductibles will be applied to Covered Medical Expenses for any covered Family member during the remainder of that Plan Year.

*PCM, Inc. Cost Plus HSA/HDHP Plan*
*Eff: 12/1/14*

**INPATIENT HOSPITAL/FACILITY PER OCCURRENCE DEDUCTIBLE (LEVEL I)**
The Inpatient Hospital/Facility Per Occurrence Deductible is the amount of covered Hospital/Facility charges payable by the Covered Person (in addition to the Plan Year Deductible) each time he/she is confined in a Hospital/Facility before benefits are payable. Charges used to meet this Per Occurrence Deductible will not be used to meet the Plan Year Deductible but will apply to satisfy the Annual Out-of-Pocket Maximum.

**COINSURANCE**
Coinsurance is the portion of Covered Medical Expenses shared by the Plan and the Covered Person in a specific ratio (i.e., 80%/20% and/or 60%/40%) after the Plan Year Deductible has been satisfied. The amount of Coinsurance paid by the Covered Person is applied to satisfy the Covered Person's Annual Out-of-Pocket Maximum.

**ANNUAL OUT-OF-POCKET MAXIMUM (LEVEL I and LEVEL II)**
The Annual Out-of-Pocket Maximum does not include expenses which are in excess of the Allowable Claim Limits. Please refer to the Claim Review and Audit Program section for additional information regarding Allowable Claim Limits. The Annual Out-of-Pocket Maximum is the maximum dollar amount a Covered Person will pay for Covered Medical and Prescription Drug Expenses each Plan Year including the Plan Year Deductible and Per Occurrence Deductibles. Level I Covered Charges, Level II PPO Covered Charges and Covered Prescription Drug Expenses are combined to satisfy the Level I/Level II PPO Annual Out-of-Pocket Maximum. Level II Non-PPO Covered Charges apply to satisfy the Level II Non-PPO Out-of-Pocket Maximum. Upon reaching the Annual Out-of-Pocket Maximum, Covered Medical and Prescription Drug Expenses are payable at 100% for the remainder of the Plan Year, excluding:

➢ Any Covered Charges already paid at 100% in any one (1) Plan Year period, unless otherwise specified in the Schedule of Benefits;
➢ Charges in excess of Usual and Customary, Allowable Claim Limits or charges for services that do not meet the Plan's definition of Reasonable; and
➢ Any non-compliance penalty applied when a Covered Person fails to notify the Utilization Review Company as specified in the Utilization Review (UR) Program.

**ANNUAL OUT-OF-POCKET MAXIMUM FAMILY LIMIT (LEVEL I and LEVEL II)**
The maximum Annual Out-of-Pocket amounts to be applied each Plan Year to a Covered Employee and his/her covered Dependents will not be more than the Annual Out-of-Pocket Maximum Family Limit shown in the Schedule of Benefits. As soon as that limit is met by one (1) or more Family members in the same Plan Year no further Out-of-Pocket amounts will be applied to Covered Medical and Prescription Drug Expenses during the remainder of that Plan Year.

**ONE CALL CARE MANAGEMENT RADIOLOGICAL BENEFIT**
One Call Care Management is the Preferred Radiology Network for MRI, CT and PET scans. The radiological services which are provided by One Call Care Management are payable as specified in the Schedule of Benefits.

**SELECT DIAGNOSTIC MEDICAL PROCEDURES**
The following is a list of Select Diagnostic Medical Procedures that may be performed in a Physician's office, the Outpatient department of a Hospital, free-standing center or an independent Facility. Benefits are available under the Plan as specified in the Schedule of Benefits:

1. Bone scan – Specialized x-ray of bone tissues using radioactive injection if more sensitive to bone irregularities than usual x-rays:
   a. Limited area;
   b. Multiple areas;
   c. Whole body;
   d. With vascular flow only;
   e. Three phase technique; or
   f. Tomographic (SPECT).

*PCM, Inc. Cost Plus HSA/HDHP Plan*
                                                                                                       *Eff: 12/1/14*

EXHIBIT B - PAGE 070

2. Cardiac stress test:
    a. Thallium – Use of radioactive dye to define areas of decreased blood flow in vessels of the heart while the patient exercises.
    b. Treadmill – Reading of the electrical patterns of the heart (EKG) while the patient exercises on a treadmill.
3. CT Scan – Computerized x-ray picture of a part of the body.
4. MRI (Magnetic Resonance Imaging) – Diagnostic imaging modality that uses magnetic and radio frequency fields to image body tissue non-invasively.
5. PET Scan (Positron Emission Tomography) – A three-dimensional imaging technique that allows visual examination of the internal organs and illustrates organ function.
6. Ultrasound, Echography and Sonography – The use of inaudible sound waves to outline the shape of organs and tissues in the body.  A sonogram during Pregnancy is not considered a Select Diagnostic Medical Procedure and is payable under the Plan's Lab/X-ray Benefit.
7. Myelogram – x-ray of the spine after injection of a contrast medium (dye) into a space in the spinal canal.
8. Aortography, Angiography, Lymphangiography, Venography, Transcatheter, Transluminal Atherectomy and Diskography.
9. Nuclear medicine scans.

**PLAN YEAR MAXIMUM BENEFIT**
The Maximum Amount payable for Covered Expenses during a Plan Year Benefit Period for each Covered Person is limited to a specific dollar amount, number of days or visits as specified in the Schedule of Benefits. The Plan Year is from December 1 through November 30 of the next year. The initial Plan Year Benefit Period is from a Covered Person's effective date through November 30 of the same or next year. The Plan Year Maximum Benefits are determined by combining both Level I and Level II (PPO and Non-PPO) Covered Charges.

**LIFETIME MAXIMUM BENEFIT**
The Maximum Amount payable for applicable Covered Expenses incurred during each Covered Person's lifetime is as specified in the Schedule of Benefits. The word "Lifetime," as used herein, means the duration of participation in this Plan maintained by the Company, either as an Employee, Dependent or COBRA Qualified Beneficiary (including prior Plan Years). The Lifetime Maximum Benefits are determined by combining both Level I and Level II (PPO and Non-PPO) Covered Charges.

**CONTINUITY OF CARE**
If a Covered Person is receiving treatment, services or supplies from a Preferred Physician and that Preferred Physician terminates or is terminated from the Preferred Physician Network or if the Plan Administrator changes PPO Networks, benefits for such services, treatment or supplies will continue to be paid at the Preferred Physician benefit level for a period of ninety (90) days from the date of the Preferred Physician's termination if the treatment, services or supplies are being provided for special circumstances such as:

➤ An acute condition;
➤ A life-threatening illness; or
➤ Past the twenty-fourth (24th) week of Pregnancy and the Covered Person is receiving treatment in accordance with the dictates of medical prudence.

Special circumstances mean a condition such that the treating Physician or health care Provider reasonably believes that discontinuing care by the treating Physician or Provider could cause harm to the patient.  Special circumstances shall be identified by the treating Physician or health care Provider who must request the Covered Person be permitted to continue treatment under the Physician's or Provider's care and agree not to seek payment from the patient of any amount for which the Covered Person would not be responsible if the Physician or health care Provider were still part of the Preferred Provider Organization (PPO) Network.

**CHARGES RELATED TO ACCIDENTAL INJURIES**
Prior to obtaining Accident details, the Maximum Benefit payable on charges arising from an Accidental Injury is $1,000. Once charges for the same related Claim equal or exceed $1,000, charges will be denied until expenses are determined to be an eligible benefit under this Plan.